Lucile L. HANDLY and Sarah M. Canopa,
Plaintiffs-Respondents,

v.

Maxwell LYONS, Executor of the Estate of
William R. Lyons, deceased,
Defendant-Appellant.

METROPOLITAN LIFE INSURANCE COM-
PANY, a corporation, Defendant-Appellant
and Third-Party Plaintiff-Appellant,

v.

Maxwell LYONS, individually as residuary
legatee under the Last Will and Testa-
ment of William R. Lyons, deceased, Third-
Party Defendant-Respondent.

Nos. 25276, 25277.

Kansas City Court of Appeals,
Missouri.

Oct. 4, 1971.

Motion for Rehearing and/or Transfer to Su-
preme Court Denied Dec. 2, 1971.

Application to Transfer Denied Feb. 22, 1972.

**452**

W. R. Schelp, Lexington, for Lucile L. Handly and Sarah M. Canopa.

Charles H. Green, Jr., Higginsville, and William Aull, III, Lexington, for Maxwell Lyons, Executor of the Estate of William R. Lyons, Deceased; Green & Green, Higginsville, Aull, Hader & Sherman, Lexington, of counsel.

John J. Kitchin, Kansas City, for Metropolitan Life Insurance Co.; Jack B. Helitzer, New York City, Swanson, Midgley, Jones, Eager & Gangwere, Kansas City, of counsel.

CROSS, Judge.

On December 26, 1965, William R. Lyons, a retired United States postal employee, who had worked some forty years under Civil Service at the Higginsville Post Office, departed this life. He was then covered as an insured by a group policy of life insurance issued by defendant Metropolitan Life Insurance Company, procured by the United States Civil Service Commission, insuring various federal employees. Upon his demise, benefits in the amount of $8,000.00 became due and payable, under terms of the policy.

Notwithstanding a substantial showing that plaintiffs Lucile L. Handly and Sarah M. Canopa (respectively sister and niece of the deceased) were lawfully designated beneficiaries under the policy, entitled to the proceeds, Metropolitan made payment of the $8,000.00 to Maxwell Lyons, executor of the estate of deceased.

This somewhat complex multi-party action commenced as a suit by plaintiffs Handly and Canopa against both Metropolitan and Maxwell Lyons, executor. Plaintiffs claim recovery against Metropolitan on the ground that they were law-

fully designated beneficiaries of the insured. They claim against Maxwell Lyons, executor, on the basis that the $8,000.00 he received from Metropolitan belonged to them. Metropolitan denied plaintiffs' action on the ground that the insured's beneficiary designation was not lawfully sufficient, and that plaintiffs had not submitted due proof they were entitled to payment. Additionally, defendant Metropolitan filed a cross-claim against defendant Maxwell Lyons for restitution of the $8,000.00 paid him in the event plaintiffs prevailed. Defendant Metropolitan also filed a third party action against Maxwell Lyons, individually, claiming that if Metropolitan is adjudged liable to plaintiffs, it should recover against Maxwell Lyons, individually, as the sole residuary legatee under the will of William R. Lyons, deceased. Defendant Maxwell Lyons, both as executor and individually, denied any liability to either plaintiffs or Metropolitan on their claims.

Upon trial, the court found that plaintiffs were entitled to recover the insurance proceeds from Metropolitan and entered judgment that Metropolitan pay plaintiffs the principal proceeds sum of $8,000.00, with interest from May 5, 1966, together with $800.00 damages for vexatious refusal to pay, and reasonable attorneys' fees in the amount of $1,818.75, a total sum of $10,-618.75. The court found in favor of Metropolitan on its cross-claim against defendant Maxwell Lyons, executor, and adjudged that he pay Metropolitan the sum of $8,000.00. Recovery was denied Metropolitan as against Maxwell Lyons individually.

Defendant Metropolitan has appealed from the entire judgment, except that part which awarded judgment in its favor on its cross-claim against Maxwell Lyons, executor. Defendant Maxwell Lyons, executor of the Estate of William R. Lyons, deceased, has appealed from the judgment in favor of Metropolitan on its cross-claim against him as such executor. The two appeals have been consolidated. Our consideration of the appeals will be in the order stated.

The group insurance policy involved here was issued on August 29, 1954, by defendant Metropolitan Life Insurance Company, to the United States Civil Service Commission, as nominal policyholder, pursuant to the Federal Employees Group Life Insurance Act of 1954, 5 U.S.C.A. Section 8701 (formerly 5 U.S.C.A. Section 2091). The policy automatically insured federal employees referred to in the act. The policy premium was paid pro rata by those employees through payroll withholding and by contributed federal funds. Individual certificates summarizing the principal policy provisions were issued to the several employees.

Metropolitan admits that William R. Lyons was an insured under the policy and that life insurance benefits in the amount of $8,000.00 were payable upon his death. Both the federal act referred to and the policy provide explicitly what persons shall receive payment of benefits upon death. 5 U.S.C.A. Section 8705 provides:

"(a) The amount of group life insurance and group accidental death insurance in force on an employee at the date of his death shall be paid, on the establishment of a valid claim, to the person or persons surviving at the date of his death, in the following order of precedence:

First, to the beneficiary or beneficiaries designated by the employee in a signed and witnessed writing received before death in the employing office or, if insured because of receipt of annuity or of benefits under subchapter I of chapter 81 of this title as provided by section 8706(b) or (c) of this title, in the Civil Service Commission. For this purpose, a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed has no force or effect.

Second, if there is no designated beneficiary, to the widow or widower of the employee.

Third, if none of the above, to the child or children of the employee and descendants of deceased children by representation.

Fourth, if none of the above, to the parents of the employee or the survivor of them.

Fifth, if none of the above, to the duly appointed executor or administrator of the estate of the employee.

\* \* \*"

The policy provisions applicable to the issues are as follows:

"Section 5. INSURING CLAUSES. \* \* \* Payment shall be made to the Beneficiary of record of the Employee or otherwise as provided in Section 11 hereof immediately after receipt of such proof (of death) and of proof that the claimant is entitled to such payment."

"Section 11. BENEFICIARIES. Any Employee insured hereunder may designate a Beneficiary and may, from time to time, change his designation of beneficiary, only by filing written notice thereof signed and witnessed, with his employing office or, in the case of (1) a retired Employee and (2) an Employee whose Life Insurance hereunder is continued while he is in receipt of benefits under the Federal Employees' Compensation Act, with the Policyholder, whereupon an acknowledgment of such designation or change will be furnished the Employee. \* \* \* A designation or change of beneficiary shall take effect only if it is received by the appropriate office prior to the death of the Employee and shall be effective as of the date of receipt of said written notice."

"\* \* \* If, at the death of the Employee, there be no designated Beneficiary as to all or any part of the insurance, then the amount of insurance payable for which there is no designated Beneficiary shall be payable to the person or persons listed below surviving at the date

of the Employee's death, in the following order of precedence:

(1) To the widow or widower of the Employee;

(2) If neither of the above, to the child or children of such Employee and descendants of deceased children by representation;

(3) If none of the above, to the parents of such Employee or the survivor of them;

(4) If none of the above, to the duly appointed executor or administrator of the estate of such Employee;

\* \* \*."

The individual certificate delivered to employees provides essentially the same as the federal act and the policy with respect to beneficiary designation. It states:

"If you want to name a beneficiary or change the designation, you can do so by filing a written notice, signed and witnessed, with your employing office which can supply appropriate forms for this purpose. \* \* \* Any designation of beneficiary, to be valid, must be received by your employing office before your death."

It is not disputed that on June 14, 1957, William R. Lyons executed a "Designation of Beneficiary" on Standard Form No. 54, a blank form promulgated and furnished by the U.S. Civil Service Commission. Therein he named his sister, Lucile Handly, and Sarah M. Canopa, a niece, as his beneficiaries to share equally the policy proceeds. The designation was signed at the Higginsville Post Office by the insured and by fellow employees Delmos W. Gillilan and Charles H. Gallatin, as witnesses, both of whom testified to those facts. Neither witness remembered what was done with the form after it was completed. According to Commission regulation the form was to remain in the employee's personnel folder until such time as he retired or died. Upon retirement of an employee, his SF 54 was to be forwarded to the Commission, together

with other relevant documents and information. Following the insured's demise the SF 54 designation, as above described, was found by the postmaster in insured's personnel file as the Higginsville Post Office under circumstances to be noted. The personnel file referred to was a separate folder or jacket of papers and documents reflecting the insured's employment history. Such files were maintained for all employees who worked at the post office, ordinarily fifteen in number. The individual files contained numerous papers and records—some of them, including insured's, "anywhere from seventy-five to one hundred documents." The personnel files were kept in a steel filing cabinet in a walk-in vault. Only the postmaster or his assistant had the vault combination or access to the files. The evidence shows that between the time the insured signed the SF 54 and the trial date, the only such persons with access to these "personnel records" were Mr. William Charles Pevestorff, the postmaster, Mr. Lewis W. Johnson, assistant postmaster, and Mr. Charles H. Gallatin, who succeeded Mr. Johnson as assistant postmaster. Mr. Pevestorff testified that the postmaster and assistant postmaster had "complete control of all personnel folders" and that if an employee wanted to place a paper in his personnel jacket he would deliver it either to the postmaster or the assistant, which official would place it in the employee's personnel jacket.

The insured retired December 8, 1965, while ill and confined in a hospital. His retirement papers were "processed" by Mr. Johnson, who was at that time the assistant postmaster. He did not "look through this personnel jacket page by page", but merely took from it "the things that I needed to get." In doing so he did not see the SF 54 form—he "overlooked" it. After the retirement papers were prepared by Mr. Johnson, the postmaster signed them (although he did not go through the personnel folder), and Mr. Johnson took them to the hospital for signature by the insured. As submitted to the Civil Service Commission, the retire-

ment forms certified that the insured had no beneficiary designation on file as of November 21, 1965.

On January 11, 1966, following the insured's death on December 26, 1965, the Commission inquired of the Postal Data Center at St. Louis whether a beneficiary designation was on file and received the reply from that agency that "No SF 54 on file". Without further inquiry, the Commission on March 3, 1966, wrote a letter to defendant Maxwell Lyons, executor, advising him that benefits were payable under the deceased insured's life policy and that no beneficiary had been designated by insured. A claim form was enclosed in the letter, which stated that the person entitled to payment should sign and return the completed claim form. On March 8, 1966, defendant Lyons completed and executed the form himself, as executor, and mailed it to the Civil Service Commission. In turn, the Commission forwarded the claim to Metropolitan. It was received by Metropolitan on March 17, 1966, together with a memorandum indicating that there was "No SF 54 on File in C.S.C."

In the latter part of February or the first part of March, 1966, Mr. Pevestorff discovered the insured's SF 54 in his personnel folder at the Higginsville Post Office. Mr. Pevestorff testified that he found the document while going through the folder, preparatory to forwarding it to the Postal Employees Record Center. The first thing he did was to call in Maxwell Lyons and show him the SF 54 beneficiary designation. Maxwell Lyons admits Mr. Pevestorff called him in and showed him "some papers" before he made his claim as executor. It was Mr. Pevestorff's testimony that when Maxwell Lyons was shown the form he stated that "he thought he had a carbon copy which was legible and he couldn't tell exactly what information was on it." Then Mr. Pevestorff "immediately" forwarded the document to the Civil Service Office in Washington with a notation that it had been found "in a file of papers left at the Post Office by Mr. Lyons." The only com-

munication he received thereafter from that office relative to the SF 54 was a telephone request for written statements from the two employees who signed the SF 54 as witnesses, and from himself, as to its validity. Written statements were forwarded as requested, together with a written statement by Mr. Johnson, who had "retired" the insured. Copies of the statements were offered by plaintiffs but were not received in evidence. On March 18, 1966, the Civil Service Commission forwarded to Metropolitan the SF 54 and Mr. Pevestorff's accompanying notation. Those papers were received by Metropolitan on March 21, 1966.

After so receiving the SF 54 form designating plaintiffs as beneficiaries, and before payment of the policy proceeds, Metropolitan made no further inquiry or investigation into the matter except to request of Maxwell Lyons, by letter, that he check the insured's personal effects "for any Designation of Beneficiary Standard Form 54 executed by the insured". Through his attorney Maxwell Lyons replied that, "after an exhaustive search of Mr. Lyons' effects, we find no Form 54 as suggested in your letter." Specific admission was made on behalf of Metropolitan by John Byrnes, its claims supervisor, that between March 21, 1966, the time it received the SF 54, and May 5, 1966, the date it paid the policy proceeds to the executor, Metropolitan made no communication with Mr. Pevestorff or the local office for information as to whether the form was in the insured's file. Under those circumstances, Metropolitan paid the $8,000.00 policy proceeds to the executor on May 5, 1966. It was made clear by Metropolitan's claims supervisor that the determination to pay the executor instead of plaintiffs was Metropolitan's own decision.

Mrs. Canopa, niece of the deceased, lives in California. Mrs. Handly, his sister, lives in New Jersey. Both of them attended his funeral. Mrs. Canopa testified that her mother died when she was eleven days old and that her grandparents and her uncle

(the deceased) raised her. Following her uncle's death she made inquiry about his life insurance because she had reason to believe she was a beneficiary. She first wrote to attorneys in Lexington, Missouri, but received no information. Thereafter, she ineffectually corresponded with the Civil Service Commission, receiving only the information that there was no beneficiary designation on file. No claim blank was tendered her by the Civil Service Commission or by Metropolitan.

Mrs. Handly testified that she discussed the matter of her brother's insurance with Maxwell Lyons on the day of his funeral and later on February 13, 1966, "when we came for the distribution of the antiques." According to her testimony, Maxwell Lyons stated that the deceased had *both* a retirement fund and an insurance policy, and that "there was a paper which Mr. William Lyons had not sent in to Washington." The witness understood Maxwell Lyons to say that he was aware of some form naming an insurance beneficiary—"that he had seen the paper". In early June Mrs. Handly wrote a letter to Mr. Pevestorff inquiring as to the status of her brother's insurance. The letter "finally ended up in Washington, D. C." Mrs. Handly corresponded with the Civil Service Commission in like manner as had Mrs. Canopa, with like results—receiving only advices that there was no beneficiary designation on file with that agency or the employing office. Nor was any claim form tendered her by the Commission or Metropolitan.

In November, 1966, plaintiff Handly's husband went to Metropolitan's office in New York on behalf of plaintiffs and discussed their interests in the policy benefits with John Byrne, Metropolitan's chief claims examiner, previously identified. After being shown the SF 54 by Mr. Byrne, wherein Mrs. Handly and Mrs. Canopa were designated as beneficiaries of the policy, Mr. Handly requested payment by Metropolitan accordingly.

Mr. Byrne informed Mr. Handly that the policy proceeds had already been paid to

the executor and undertook to explain why payment was not made to plaintiffs. He admitted there was no question that the SF 54 Metropolitan had received was in writing, properly signed and witnessed, and that it was the proper form for designating a beneficiary. He stated that Metropolitan's refusal to recognize the form and denial of payment to plaintiffs was because (1) a space in the lower right hand corner had not been "completed" in that it bore no signature or initials of any "receiving officer", and (2) because Metropolitan felt there was no evidence the beneficiary designation had ever been filed at insured's place of employment. In the witness's words, "There is no evidence on the form that it was ever received in the employing office. * * * I think it calls for a date, and it calls for initials of the person receiving." From extensive cross-examination of witness Byrne, it is apparent that Metropolitan's faith attached to the initial notification from the Postal Record Center in St. Louis that there was no SF 54 there on file, and that Metropolitan chose to ignore the later advice from the Higginsville Postmaster that the form had been found in the employing office, as well as the accompanying document itself. Further testifying, Mr. Byrne stated that even if plaintiffs had filed a formal claim on a form provided by Metropolitan, that wouldn't have made any difference in his decision and Metropolitan would not have made payment to plaintiffs. At no time did Metropolitan consider filing an interpleader action.

Maxwell Lyons testified that the first time he ever heard of any insurance belonging to deceased was "when I got that letter from that fellow, Babel, or something" (the Civil Service Commission's letter of March 3, 1966, to the executor in which was enclosed a blank claim form for use by the proper beneficiary). The witness admitted that Mr. Pevestorff had previously shown him "some papers" but testified, "I can not say they were insurance papers." Subsequently, on March 8, he executed the claim on behalf of himself and mailed it. He denied having told Mr. Pevestorff that he

thought he had a copy of the SF 54. He also denied having discussed the subject of deceased's insurance with Mrs. Handly or Mrs. Canopa.

William R. Lyons, the deceased, was not survived by a widow, a child or children, or any parent. Maxwell Lyons, the executor of William R. Lyons' estate, is the residuary legatee in the deceased's will. If the insurance proceeds paid the executor are adjudged to be lawful assets of the estate, upon its final distribution, those moneys will pass from Maxwell Lyons, the executor, to Maxwell Lyons as an individual. The fund of $8,000.00 still reposes intact in the hands of the executor.

Upon rendering judgment, the trial court filed a memorandum opinion as follows:

"MEMORANDUM OPINION

William R. Lyons, a postal employee, died on December 26, 1965. At the time of his death he was insured by Metropolitan Life Insurance Company in the amount of $8,000.00. The policy provided, 'Any Employee insured hereunder may designate a Beneficiary _ _ _ only by filing written notice thereof, signed and witnessed, with employing office _ _'. William R. Lyons, deceased, under date of June 14, 1957, made a valid designation of beneficiary naming plaintiffs as his beneficiaries on Form No. 54. This form was on file with his papers in the employing office at the time of his death. After the death of William R. Lyons, the proper officials in the employing office did not find form No. 54, and defendant Metropolitan Life Insurance Company was so notified. About March 1, 1966, form No. 54 was found in William R. Lyons' papers at the employing office. It was forwarded and received by defendant Metropolitan Life Insurance Company on March 21, 1966. On March 17, 1966, Metropolitan received a claim form FE–6 from Maxwell Lyons, Executor of the Estate of William R. Lyons, deceased. Thereafter on May 5, 1966,

defendant Metropolitan Life Insurance Company elected to pay $8,000.00, the amount of the policy to Maxwell Lyons, Executor, and issued a check therefor. The plaintiffs did not have access to any of the records but were concerned about the proceeds of the insurance policy. There is ample evidence that plaintiffs were continually trying to obtain information about the insurance policy.

Under the facts of this case, this Court holds that defendant Metropolitan Life Insurance Company paid the $8,000.00 to the wrong party and has refused to pay the properly designated beneficiaries, the plaintiffs in this action. This Court further holds that after having notice of the designation of beneficiaries for about six weeks before payment was made, and a refusal to pay the plaintiffs as beneficiaries, the action of defendant Metropolitan Life Insurance Company was vexatious and without reasonable cause.

Defendant Metropolitan Life Insurance Company by cross-claim asks judgment against Maxwell Lyons, Executor of the Estate of William R. Lyons, deceased, on the grounds of mistake and unjust enrichment. The $8,000.00 paid to the Executor is still intact and there is no change in circumstances of the parties which would require a judgment other than one against the Executor in favor of the Metropolitan Life Insurance Company for the $8,000.00 erroneously paid."

■ In Metropolitan's first appeal point it is contended that plaintiff was not entitled to judgment because the beneficiary designation "was not properly received and recorded in the postal employing office prior to insured's death." Arguing the point, Metropolitan states that to have been valid, the SF 54 must not only (1) have been filed with insured's employing agency (the Higginsville Post Office), but also (2) must have been "approved and acknowledged by that agency prior to his death." This latter phase of the argument

is largely bottomed on the circumstance that the document does not show on its face, by the signature or initials of some official, that it was received in the insured's place of employment, prior to the insured's death.

The validity of the beneficiary designation is to be tested by the provisions of the policy and applicable law. In order for an insured to effect a valid designation or change of a beneficiary, Section 11 of the policy, as amended to conform with the Federal Act, requires only (1) a notice of the insured's intention, in writing, (2) signed by insured, (3) witnessed, and (4) filed with the employing office prior to the insured's death. The SF 54 in this case satisfied these requirements. No provision of the policy or any appertaining law requires that the "notice" itself shall bear the signature or identification of the individual to whom it is tendered for filing or who receives it on behalf of the employing office. Nor is it essential to the validity of a beneficiary designation that the date of the document's receipt by the employing office shall be inscribed thereon by the officer to whom it is delivered or that the paper be "approved and acknowledged" by the receiving office or that it be "recorded" by any agency. These suggested requirements are not prescribed by the policy. Since we are governed by the language of the policy, Sims v. Missouri State Life Insurance Co., 223 Mo.App. 1150, 23 S.W.2d 1075, we decline to read into it any ground on which the insurer might avoid liability that is not clearly expressed therein. Greer v. Zurich Insurance Co., Mo. Sup., 441 S.W.2d 15. Applying the foregoing standards, we hold that the SF 54 is a valid designation of plaintiffs as beneficiaries—subject to proof dehors the instrument itself that it was filed with the employing agency (Higginsville Post Office) prior to the insured's death. That is a disputed issue of fact, which, if found in the affirmative, as did the trial court, would require affirmance of the award to plaintiffs.

We are convinced by the record in this case, as was the trial court, that William R. Lyons, in his lifetime, had filed the properly signed and witnessed SF 54 with his employing office, the Higginsville Post Office, and thereby lawfully designated plaintiffs as the beneficiaries of his policy. In arriving at this view we have taken into due consideration all testimony pointed to by Metropolitan as tending to show otherwise. It is true that the only two officials authorized to recieve and file the form had no independent memory of having done so, although they do not foreclose that possibility. Bearing in mind that some ten years had elapsed since the form was executed (in the same office where it was found), it is reasonable that the memory of those two officials could not be expected to recall in detail each of seventy-five to one hundred documents in fifteen separate individual personnel folders. Nor are plaintiffs to be foreclosed because the postmaster and his assistant overlooked the SF 54 in processing the insured's retirement, or because the postmaster did not discover it when the Civil Service Commission first inquired whether such an instrument was on file. The important fact is that the postmaster *did* discover the document in the insured's file in ample time to put it in the hands of Metropolitan more than six weeks before it refused plaintiffs' request for payment. We reject the possibility (at which Metropolitan vaguely hints) that some person might have placed the paper in the insured's file *after* his death. This, because both of the only two officials who had access to the personnel jacket testified that neither they, nor any other person, had placed it in the insured's file between the date of his death and the date it was found therein. The judgment that plaintiffs have the policy proceeds will not be disturbed.

Metropolitan next complains that the trial court erred in entering judgment against it for a ten per cent penalty and an attorneys' fee. So contending, Metropolitan sets up two attemptedly supportive grounds: (1) that the penalty section invoked, V.A.M.S. Sec. 375.420, is not applicable and (2) that Metropolitan's refusal to pay was not in fact vexatious. Arguing the first ground, Metropolitan asserts that the insurance contract arose under federal law, that application for it was made in the District of Columbia, that the policy was issued in New York, and that the policy holder is the Civil Service Commission, whose office is in the District of Columbia. Hence, says Metropolitan, the policy is not a Missouri contract, and the law of the state where the contract is made will be applied. Metropolitan cites (among others) the case of Thompson v. Traders' Insurance Co. of Chicago, 169 Mo.Sup. 12, 68 S.W. 889, and thereby severely undercuts its position on the question. The Thompson case involved a Kansas contract of insurance and a property loss which occurred in Kansas, under which circumstances the place of performance was clearly in the State of Kansas. Our Supreme Court said:

"In Scudder v. Bank, 91 U.S. 406, 23 L.Ed. 245, the supreme court of the United States formulated a rule bearing upon the doctrine of the lex loci contractus, lex loci rei sitae, and lex fori, as follows: 'Matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, admissibility of evidence, statutes of limitation, depend upon the law of the place where the suit is brought.' The Missouri statute imposing this penalty for vexatious delay does not relate to the remedy. It is a matter connected with the performance of the contract. Hence it can only apply to contracts that are to be performed in Missouri. It has no application to contracts like the policy in suit, which was made in Kansas, where the property in-

sured was located and was destroyed in Kansas where the contract was to be performed in Kansas, and where the cause of action accrued and became complete in Kansas. It could not be that under the laws of Kansas the defendant would not be liable for damages for vexatious delay, but because the venue is transitory the plaintiff could sue in Missouri instead of in Kansas, and under the Missouri statute recover damages for vexatious delay. The Missouri law applies only to the remedy in this case. The law of Kansas applies to the contract, and to all matters pertaining to the performance thereof. Hence the Missouri rule applies to the waiver, while the Missouri statute allowing damages for vexatious delay does not apply."

Thus the court held in Thompson that matters pertaining to *performance* of the contract were governed by the law of the state where the contract was to be performed, and properly ruled that the Missouri penalty statute does not apply where the cause of action accrued in and was to be performed in the State of Kansas. It is implicit in the Thompson case that in cases where an insurance contract is to be performed in Missouri, the vexatious penalty statute of Missouri would apply. The implication in Thompson has developed into a positively stated rule embodied in a succession of Missouri decisions. See Rippstein et al. v. The St. Louis Mutual Life Insurance Co., Mo.Sup., 57 Mo. 86; Martin v. Mutual Life Insurance Co. of New York, 190 Mo.App. 703, 176 S.W. 266, cited in 44 C.J.S. Insurance § 53, p. 516; Johnston v. Progressive Life Insurance Co., 293 Mo.App. 184, 192 S.W.2d 649.

■ The case of Martin v. Mutual Life Insurance Company of New York, above cited, is leading authority that matters connected with performance of the contract are governed by the law of the state where it is to be performed, that a vexatious refusal to pay is a matter connected with the performance of the contract, and that the

place of performance of a life insurance contract is where the death occurs. In the course of the opinion (by Nortoni, J.) the court quoted the same exerpt from Thompson v. Traders Insurance Company that we have above set out herein. Following that quotation, the Martin opinion continues:

"Even under the authority of that case (Thompson) it is manifest the court declares in plain terms that matters connected with the performance of the contract are regulated by the law prevailing at the place of performance, and the court declares, too, that a vexatious refusal to pay is a matter connected with the performance of the contract. No one can doubt that a contract of life insurance, providing for the payment of an amount on the event of the death of the insured, is transitory in character, without regard to the place of its original execution, and that it follows the person of the insured, so as to enable the enforcement of performance where the death occurs. The performance contemplated in such a contract is the payment of the amount agreed when the death occurs, and the cause of action accrues where that event takes place. See Rippstein v. St. Louis Mutual Life Ins. Co., 57 Mo. 86. The matters pertaining to the performance of the contract are to be determined under the law of the place where the performance is to be had, and the court very properly submitted to the jury the matter of damages for vexatious refusal to pay."

William R. Lyons was a resident of Missouri, his place of employment was in Missouri, and his demise also occurred in this state. Under the authorities we have noted, regardless of where the policy contract was executed, and regardless of what state it may be said to be a contract, it is eminently clear that the situs of the contract's performance was in the State of Missouri, and, perforce, that the cause of action also arose in Missouri. Being a matter pertaining to performance of the contract, the issue of awarding a penalty

and attorneys' fee under Section 375.420 is a matter of Missouri law, and the cited statute is applicable to the question. The trial court properly entertained jurisdiction of the issue.

 We next attend the question whether, under the facts, Metropolitan should be held guilty of vexatiously refusing to pay the plaintiffs. We determine that issue under the fundamental rule that in awarding damages and attorney fees each case must turn on its own particular facts. We recognize also that in order to recover the statutory penalty and attorneys fees, it is not necessary to show affirmatively that the delay was vexatious. It is only required that the evidence and circumstances of the case be sufficient to justify the conclusion that the refusal was vexatious. Western Casualty and Surety Co. v. Southwestern Bell Telephone Co., 8th Cir., 396 F.2d 351; Coscarella v. Metropolitan Life Insurance Co., 175 Mo.App. 130, 157 S.W. 873. At the risk of repetition we note that Metropolitan had received all information it had sought concerning the policy, including the SF 54 form, in its office on March 21, 1966, more than six weeks before paying the policy benefits to Maxwell Lyons, the executor. The only question that could have been directed to the validity of the SF 54, which Metropolitan held in its own hands all that time, was whether the form was on file in the personnel jacket of deceased when he died. For that entire six weeks period, Metropolitan did absolutely nothing to determine the circumstances of the document's disposition and whereabouts, except to inquire of the executor if there was a carbon copy in the deceased's personal effects. Metropolitan ignored the official in charge of the employing office to whom it could have addressed inquiry. Metropolitan's failure to contact and communicate with, and seek information from plaintiffs is significant in the instant question, as is Metropolitan's failure to follow an alternative procedure such as interpleader, which would have relieved it of responsibility to plaintiffs. Considering the opportunity and facilities for investigation available to Metropolitan, during the extended period between March 21 and May 5th, together with the fact that it made no substantial or good faith inquiry further into the question, we feel that its refusal to pay plaintiffs was wilfull, unreasonable and without probable cause. Hence it must be held guilty of vexatiously refusing to pay plaintiffs the policy benefits. The trial court did not err in allowing plaintiffs the statutory penalty and attorneys' fees.

Metropolitan's brief presents a third point—a submission that the trial court should have entered a judgment against defendant Maxwell Lyons, executor, for the full amount of the judgment entered against Metropolitan in favor of plaintiffs. This contention is made on the theory that under principles of equity Metropolitan was entitled to full reimbursement for all liability to plaintiffs—meaning policy proceeds, interest, penalty and attorney's fees. This point will receive attention in connection with our consideration of the appeal by Maxwell Lyons, executor.

As an appellant, executor Maxwell Lyons agrees that if the trial court reverses the award in favor of plaintiffs, there remains no issue as to whether payment to the executor was justified. In the alternative, executor Lyons contends that if this court sustains the trial court's award to plaintiffs, Metropolitan is not entitled to recover the money it had paid him. The substance of his argument is that the payment "was voluntarily made by Defendant Metropolitan with full knowledge of all the facts, or at least with an unlimited opportunity to so inform itself, and can not be recovered because defendant Metropolitan's misconception of its policy obligation was a mistake of law, and not a mistake of fact." Thus appellant executor appeals to the equitable conscience of the court under the general doctrine that equity will not afford relief against a mistake of law, as distinguished from a mistake of fact. In greater particularity, the rule relied upon by appellant, as

stated by this court, is that "a voluntary payment made under a mistake or in ignorance of the law, but with full knowledge of all the facts, *and not induced by any fraud or improper conduct on the part of the payee,* cannot be recovered back." (Italics supplied.) Wilkins v. Bell's Estate, Mo.App., 261 S.W. 927. Of this doctrine, more hereinafter will be said.

■ Likewise, respondent Metropolitan has invoked principles of equity in aid of its claim for recovery of the money paid the executor. Whether Metropolitan's cross-claim be termed an action for restitution, or for money had and received, it is grounded on the fundamental equitable principle that "a person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of the Law, Restitution, p. 12. A suit for money had and received is in the nature of an equitable action, and is maintainable whenever a person has received money which in equity and good conscience belongs to and should be paid to another. See the numerous cases so holding in 20A Mo.Digest, Money Received, ☞1, p. 681. As stated in Brink v. Kansas City, 355 Mo. Sup. 860, 198 S.W.2d 710, "Such an action is founded 'upon the principle that no one ought unjustly to enrich himself at the expense of another, and it is maintainable in all cases where one person has received money or its equivalent under such circumstances that in equity and good conscience he ought not to retain it and, ex aequo et bono, it belongs to another.' 4 Am.Jur. p. 509." The action for money had and received is flexible, is a favorite of the law, and the tendency is to widen its scope. 20A Mo.Digest, Money Received, ☞1, p. 681.

As a court called upon by both parties to administer equity in deciding the instant question, we take cognizance both of the general doctrine that payment of money under mistake of law, not induced by fraud or improper conduct on the part of the payee, may not be recovered back, and the rule that a person who has been unjustly enriched at the expense of another must make restitution to that person. However, as was said in Northrop's Executors v. Graves, Conn., 50 Am.Dec. 264, "These, and all other general doctrines and aphorisms, when properly applied to facts and in furtherance of justice, should be carefully regarded; but the danger is, that they are often pressed into the service of injustice, by a misapplication of their true meaning. It is better to yield to the force of truth and conscience, than to any reverence for maxims."

■ The general rule relied upon by appellant executor (that equity will not relieve against a mistake of law) does not enjoy the high favor that courts accord the doctrine of restitution and is subject to numerous exceptions. The modern trend of judicial opinion is clearly in the direction of liberalizing the general rule denying relief from mistakes of law which, admittedly, is a harsh one. In numerous cases relief has been granted in order to prevent injustice or unconscionable advantage. Some courts have declared that the important question is not whether the mistake was one of law or of fact, but is whether the case falls within the fundamental principle of equity that no person shall be unjustly enriched at the expense of another. See 27 Am.Jur.2d, Equity, Sec. 37, p. 561. Other recognized authorities are equally critical of the rule.[1] Whatever may be the

1. Pomeroy's Equity Jurisprudence, Fifth Edition, Sec. 851b evaluates the rule as follows: "Trend of Modern Decisions as to Mistakes of Law.—The trend of judicial opinion in modern times is towards the modification of the old rule that equity will give relief only against mistakes of fact, as distinguished from mistakes of law. This is evidenced by the many cases in which equitable jurisdiction is entertained for relief against mistakes of law, sometimes on the express ground that such mistakes are as much a subject for equitable relief as mistakes of fact, or that it is immaterial whether the mistakes are of fact or of law, and sometimes on the theory that the particular mistake of law is of a character for

status of the general rule, it is universally acknowledged that equity always relieves against a mistake of law when the surrounding facts raise an independent equity, as where the mistake is induced, or is accompanied by inequitable conduct of the other party. 30 C.J.S. Equity § 47, p. 871. Missouri cases recognizing this exception include Wilkins v. Bell's Estate, supra, and Columbia Building & Loan Ass'n v. Gill, Mo.App., 285 S.W. 181. We quote the exceptive rule as it is stated in Pomeroy's Equity Jurisprudence, Fifth Ed., Sec. 847, p. 304:

"Mistake of Law Accompanied with Inequitable Conduct of the Other Party. Whatever be the effect of a mistake pure and simple, there is no doubt that equitable relief, affirmative or defensive, will be granted when the ignorance of misapprehension of a party concerning the legal effect of a transaction in which he engages, or concerning his own legal rights which are to be affected, *is induced, procured, aided, or accompanied by inequitable conduct of the other parties. It is not necessary that such inequitable conduct should be intentionally misleading, much less that it should be actual fraud; it is enough that the misconception of the law was the result of, or even aided or accompanied by, incorrect or misleading statements, or acts of the other party.* When the mistake of law is pure and simple, the balance held by justice hangs even; but when the error is accompanied by an inequitable conduct of the other party, it inclines in favor of the one who is mistaken." (Emphasis supplied.)

which equity will give relief, though it ordinarily would not; and the cases in which the courts have displayed a marked inclination to regard a mistake as one of fact wherever it is doubtful that it is one of law. In proper cases relief has been given although the parties knew what words were employed and their ordinary meaning.

By statute in some jurisdictions relief may be granted from a mistake of law as well as of fact. Moreover, justice and reason appear to demand that the courts in general adopt the suggestion of an eminent author (Williston on Contracts) and put mistakes of law and of fact on the same footing, thereby attaining some degree of certainty and uniformity in decisions with respect to this subject.

However, in many cases, a stated ground upon which relief is denied is that the mistake is one of law. But often in such cases there are no attendant special circumstances justifying equitable relief. Undoubtedly the difficulty of producing objective evidence of conduct is frequently greater in cases of mistake of law than in cases of mistake of fact, but this should not militate against granting relief in a proper case whenever satisfactory evidence can be produced."

Corbin in Vol. 3 of his treatise on Contracts (1960 ed.) pp. 752-755 states the following view of the doctrine: "In spite of the many decisions and dicta pro and con—indeed, because of them, it is believed that the time has come to say that the exceptions now make the rule, that social policy requires that mistake of law and mistake of fact be treated alike, and that in granting relief for mistake the attention of the court should be directed to the other factors in the case. There will still be left enough difficulty in the court's determining what justice requires. * * *

"According to commonly stated doctrine, one who pays money under a mistake of law has no right to restitution thereof, even though it was not legally due, if the payee claimed it as of right honestly and in good faith. How the payee can, in the absence of additional factors, be regarded as 'honestly' keeping the money so paid, after he learns of the mistake of law and that his claim was unfounded, has never been made clear. It is certain that in several jurisdictions this rule has never been recognized. In all jurisdictions, there are large classes of exceptions. In most jurisdictions, cases may be found in which the decision rendered was inconsistent with the rule, though nothing was said of it and the court may have given no thought to the distinction between law and fact. And it is believed that the cases to be considered herein, dealing with rescission and reformation for mistake of law, or of legal 'rights' strongly indicate the injustice and incorrectness of the stated rule."

Also see 75 A.L.R. 896, Annotation, Relief in Equity from Mistake of Law.

■ It is evident from the executor's own testimony that Metropolitan's payment of the policy proceeds to him was induced or at least accompanied by inequitable conduct on his part, as witness the following facts of record: On direct examination he claimed that the first time he ever heard of any "insurance belonging to William Riley Lyons" was when he got the letter from the Civil Service Commission under date of March 3, 1966, advising him that the deceased had life insurance and enclosing a blank form for the proper beneficiary to use in making claim. He testified: "Q Now, at the time you mailed that in, did you know anything at all about his insurance? Had anybody told you anything about it? A I had no idea; didn't know he had any. Q You didn't know he had any insurance? A No, sir, I did not."

Later on cross-examination he admitted that "somewhere the last of February" and *prior* to "filling out" the claim form on March 8th, Postmaster Pevestorff had "called him in there" (the postoffice) and shown him "some papers", all as Mr. Pevestorff had testified, but insisted, "I didn't know whether they were insurance papers or what they were." The last quoted statement was directly contradicted by the execcutor's own attorney, who was called on his behalf as a witness. Answering the question, "Did Mr. Lyons tell you that the postmaster had told him there was a form 54?", the attorney stated, "He told me that, told me Mr. Pevestorff had showed him some forms and it had something to do with life insurance."

In view of the foregoing, coupled with the convincing testimony of the postmaster who had found the beneficiary designation, shown it to the executor and discussed it with him, we are not inclined to give credence to the executor's testimony. We believe, and accordingly find, that the executor knew the deceased had a policy of life insurance before he was so advised by the Commission's letter of March 3rd; and further, that at the very time he signed and mailed his claim for the proceeds, he knew that the deceased had executed a designation of beneficiaries other than himself. Under all standards of fair dealing and conscionable conduct he should have divulged to Metropolitan the information he had received from the Postmaster instead of remaining silent and making his own claim. By so concealing and suppressing material fact he must be held guilty of constructive fraud—certainly inequitable conduct. Therefore, under the exception to the general rule, last noted, the executor stands forfeited of any right to retain the payment on the ground it was paid under mistake of law.

In support of his appeal the executor relies most strongly, but ineffectually, upon American Motorists Ins. Co. v. Shrock, an opinion by this court, Mo., 447 S.W.2d 809. That case is distinguishable because it involved facts materially different from those considered here. In Shrock there was no showing whatsoever of any inequitable or improper conduct on the part of the payee. On the contrary, it was apparent in that case that to have required restitution would have been inequitable. The payment involved was by an insurance company to a widow under a medical provision of a liability policy for expenses of her husband's burial. After the widow had later sought and received an award of workmen's compensation benefits, payable weekly, the insurance company sought repayment on the ground that by reason of a policy exclusion there was no liability in the first instance and the payment was due to a mistake of law. Our denial of restitution was bottomed essentially on the rationale that the widow was not in the same condition as when she received the payment. The money having been paid her to defray expenses of her husband's burial, it was a reasonable assumption she had spent the money for that purpose, in the confidence it was hers, and that she had no means of repayment other than from the weekly stipend awarded her as workmen's compensation benefits. Hence, our ruling that equity would not intervene and require restitution.

It is obvious the situation in Shrock is materially different from that in this case where the entire sum of money paid, $8,000.00, remains intact in the hands of the payee.

■ Another line of argument is made by the executor to support his contention that Metropolitan should not recover its payment to him. He suggests that if this court sustains the trial court's decision that Metropolitan's refusal to pay plaintiff was vexatious, "then, a fortiori its payment to the Defendant Lyons was without legal justification and hence a mistake of law, and thus a voluntary payment that can not be recovered. Only he who does equity can seek equity, and if Defendant Metropolitan's action in not paying the insurance to Plaintiffs was unreasonable and vexatious, then Metropolitan can not utilize equity to compel a return to it of the voluntary payment made to Defendant Lyons." The foregoing argument is specious. Seeking to invoke the maxim "only he who does equity can seek equity", the executor overlooks the limitation upon the maxim that it applies only to the transaction *actually in controversy*. At present we are concerned with respective equities *as between Metropolitan and the executor* affecting Metropolitan's claim for restitution. It is of no materiality to that issue that Metropolitan may have acted inequitably in its separate transaction with plaintiffs by its vexatious refusal to pay the policy proceeds to them. "The maxim is subject to the qualification that the inequitable conduct which will defeat plaintiff's recovery must be conduct with reference to the transaction on which he bases his suit; relief will not be refused merely because of plaintiff's general bad character, nor because of particular acts of misconduct not directly involved in the suit. Even misconduct connected with the subject-matter of the suit will not defeat relief, where it does not form part of the transaction in controversy." McClintock on Equity, Sec. 26, page 63. The point is ruled in Metropolitan's favor.

■ Having determined that the executor must pay back the money Metropolitan had paid him, it is now appropriate that we consider the previously mentioned third point made by Metropolitan as an appellant —its contention that the trial court erred in entering judgment for only the $8,000.00 actually paid the executor. Metropolitan posits that there should have been rendered in its favor a "judgment over" in the full amount of the judgment awarded to plaintiffs. Thus, in addition to restitution of the sum of $8,000.00 paid out, Metropolitan asserts entitlement to recovery from the executor a sum equal to the penalty, interest and attorneys' fee awarded plaintiffs. In seeking to shift those burdens, Metropolitan relies upon the theory that when it paid the policy proceeds to the executor, an implied or legally imposed contract arose between them obligating the executor as an indemnitor under duty to pay Metropolitan *in toto* the amount of any judgment rendered against it. The foregoing is a perversion of the principles of indemnity. "In order that a person who has paid damages may be entitled to indemnity from another, it is essential that such other be the one who is primarily responsible for the negligence or wrongful act which caused the injury." 42 C.J.S. § 23, p. 600. The "wrongful act" here concerned was Metropolitan's vexatious refusal to pay plaintiffs the insurance proceeds. Thus Metropolitan was the *primary* moving party responsible for plaintiffs' entitlement to damages, interest and award of attorneys' fees. It is futile to contend that the executor—the *secondary* party—should bear the burden resulting from Metropolitan's dereliction. Furthermore, Metropolitan has only itself to blame for its judgment liabilities to plaintiffs in excess of the face amount of the policy. As has been noted, Metropolitan could have relieved itself of such liabilities by filing an action for interpleader and placing the funds in the hands of the court, subject to rival claims. Having failed to protect its interest by utilizing that available procedure, Metropolitan must now be content

with its judgment against the executor for the principal sum of $8,000.00.

Accordingly, we affirm the judgment as rendered.

All concur.