**Eva N. NELSON, Plaintiff,**

v.

**AETNA LIFE INSURANCE COMPANY, Defendant.**

**No. 19446-1.**

United States District Court,
W. D. Missouri, W. D.

May 9, 1973.

ᵎAs Amended May 11, May 24
and June 5, 1973.

Lyman Field, Rogers, Field, Gentry, Benjamin & Robertson, Kansas City, Mo., for plaintiff.

Morris J. Nunn, Morrison, Hecker, Cozad, Morrison & Curtis, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

*JOHN W. OLIVER, District Judge.*

### I.

This is an action on a group insurance policy for the alleged accidental death of one Paul N. Vishino. The master group policy was delivered by defendant Aetna Life Insurance Company to Mr. Vishino's employer, Skelly Oil Company in Tulsa, Oklahoma, Skelly's home office. That group policy contained a provision that it "shall be construed in accordance with the law of the jurisdiction in which it is delivered." Both Aetna and Skelly were authorized to and did in fact transact business in Missouri. Mr. Vishino entered Skelly's employ in Kansas City, Missouri. His certificate of insurance was delivered to him in Missouri. Skelly paid no part of the premium for Mr. Vishino's coverage.

Mr. Vishino met his death, under the circumstances to be detailed, in Missouri. Although Mr. Vishino spent some time in a Skelly training program in Tulsa, Oklahoma, shortly before his death, we shall find that he had not in fact moved to Oklahoma and was, from the time he became an insured under the group policy

until the time of his death, a citizen and legal resident of Missouri.

Defendant Aetna initially rejected plaintiff's claim from the outset and has consistently contended after litigation commenced that plaintiff is not entitled to recover under Oklahoma law, that Oklahoma law governs the case, and that Section 376.620 R.S.Mo. may not properly be applied to this case. That Missouri statute provides:

> In all suits upon policies of insurance on life hereafter issued by any company doing business in this state, to a citizen of this state, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void. [§ 376.620, R.S.Mo.]

Defendant accurately stated in its post-trial memorandum that "except for the proof relating to the question of Paul Vishino's sanity or insanity at the time of his death, most of the essential facts in [this] case have either been stipulated or have not been contested." It is also true that although other legal questions are presented and will be decided, the primary legal question upon which this case turns is the question of whether Missouri or Oklahoma law should be applied. Under Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) and Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court must in this diversity case apply the conflicts of law rules which it concludes the courts of Missouri would apply to the factual situation presented.

We shall make our findings in the next part of this opinion. The first twenty-seven paragraphs of those findings are stipulated. Many of the other findings reflect contemporaneous documentary evidence. Still other findings were not in substantial dispute. The findings in regard to contested issue in regard to plaintiff's mental condition at the time of his death, of course, reflect our findings in plaintiff's favor and our express rejection of defendant's suggested findings.

Our formal conclusions of law will be stated in part III of this opinion. Those conclusions generally follow the pattern suggested by counsel. The parts of this opinion which follow our formal conclusions have been added in order to give the parties and the Court of Appeals the benefit of the reasons why we believe we have properly applied the law which the courts of Missouri would probably apply to the facts as we have found them.

## II. FINDINGS OF FACT

1. Skelly Oil Company is a Delaware corporation, which at all times herein has been, and is, authorized to do business, and doing business in the State of Missouri, and maintaining general offices, district offices, garages, warehouses, and service centers in Greater Kansas City, Missouri.

2. The headquarters and the principal place of business of Skelly Oil Company from July 31, 1961 until the present time has been Tulsa, Oklahoma.

3. Defendant Aetna Life Insurance Company since July 31, 1961 until the present time has been a foreign insurance corporation in Missouri, organized and incorporated under the laws of Connecticut, has been authorized to transact the business of life, accident, health, sickness and group insurance in the State of Missouri, has been doing such business in Missouri, and has issued such insurance on the lives of citizens and residents of Missouri.

4. Exhibit A attached to the Stipulation of the Parties, and incorporated herein by this reference, is a true and genuine copy of Group Policy ACC 68914 and the 21 pages therein constitute the entire policy.

5. Group Policy ACC 68914 is a group insurance contract for accidental death and dismemberment insurance coverage entered into by the Skelly Oil Company and defendant Aetna Life Insurance Company.

6. Group Policy ACC 68914 was applied for by Skelly Oil Company in Tulsa, Oklahoma, on July 31, 1961, under an application signed by J. O. Kremer of Skelly Oil Company and W. A. Kohl of defendant life insurance company executed in Tulsa, Oklahoma, July 31, 1961.

7. Group Policy ACC 68914 recites, *inter alia:*

It is "a contract between the Policyholder and the Insurance Company and shall be construed in accordance with the law of the jurisdiction in which it is delivered" (page 1), that the insurance is "insurance for an employee," who "may elect the amount of his insurance (Principal Sum)," and who may "change the amount of his insurance" (pages 7–8).

8. Group Policy ACC 68914 was delivered to the policyholder Skelly Oil Company in the State of Oklahoma, as recited in the policy.

9. Group Policy ACC 68914 took effect on August 1, 1961.

10. Paul N. Vishino, deceased husband of plaintiff, was employed in Kansas City, Missouri by Skelly Oil Company on December 21, 1961, in the Marketing-Sales Training Department, as a Junior Service Salesman. At that time he was a citizen and resident of Missouri, giving the address of 5547 Wabash, Kansas City, Missouri, on his original employment application executed on December 31, 1961.

11. At all times in question up to and including July 31, 1962, Paul N. Vishino was a citizen and resident of the State of Missouri.

12. Paul N. Vishino and plaintiff were married on January 20, 1962 at Waterloo, Iowa. Upon their return to Kansas City, Missouri, they took up their residence and made their home at 5547 Wabash, Kansas City, Missouri.

13. On April 29, 1962, Paul N. Vishino applied for insurance coverage under Group Policy ACC 68914 as an employee of Skelly Oil Company while he was working for that company in Kansas City, Missouri, at a service station on Pershing Road near Union Station Plaza, and while he and plaintiff were continuing to make their home and residence at 5547 Wabash, Kansas City, Missouri.

14. Paul N. Vishino subscribed to $25,000 under "Amount of Insurance Coverage" by his written application on April 29, 1962 under Group Policy No. ACC 68914, for which he himself paid the premium through salary deduction. No part of the insurance premium for coverage for Paul N. Vishino under Group Policy ACC 68914 was paid for or contributed to by Skelly Oil Company.

15. On July 1, 1962, the insurance on the life of Paul N. Vishino became effective under Group Policy No. ACC 68914 while he was still employed by Skelly Oil Company in Kansas City, Missouri, at the same place, and was continuing to make his home and residence with plaintiff at 5547 Wabash, Kansas City, Missouri.

16. Said insurance was in effect on November 5, 1962, at the time of Paul N. Vishino's death in Kansas City, Missouri.

17. Certificate of Insurance on employees covered by Group Policy No. ACC 68914 whose insurance became effective July 1, 1962 were issued by the Skelly Oil Company at Tulsa, Oklahoma and on July 27, 1962, were sent to the respective employees.

18. On August 1, 1962, Paul N. Vishino was promoted to the position of Station Auditor and asked to undergo a training program at the Skelly Oil Auditing Department in Tulsa, Oklahoma.

19. On August 3, 1962, Paul N. Vishino in writing requested "Please make the following corrections on my policy. Beneficiary. Eva M. Vishino, wife. Secondary Beneficiary Laura C. Freeman." This request was addressed to Skelly Oil Company employee W. H. Carr in Kansas City, Missouri, and Vishino, in signing the request, listed his address as 5547 Wabash, Kansas City, Missouri. Vishino's original written request for insurance under Group Policy No. ACC 68914, which was made on April 29, 1962, listed Eva M. Vishino wife and

Laura C. Freeman sister as "beneficiaries."

20. On August 6, 1962, said W. H. Carr in Kansas City, Missouri, listing "Paul N. Vishino, Service Station Salesman, Kansas City, Missouri," sent Interdesk Correspondence to Mr. L. C. Newton of Skelly Oil Company in Tulsa, Oklahoma stating "Will you please correct the beneficiary as requested by Mr. Vishino and return the certificate." This writing bears a Tulsa, Oklahoma date stamp showing it was received there on August 7, 1962.

21. On August 13, 1962, said L. C. Newton of Skelly Oil Company in Tulsa, Oklahoma wrote "Mr. Paul N. Vishino, C/o W. H. Carr, Kansas City, Missouri" as follows:

RE: Change of beneficiary.

In response to your request for opportunity to change the beneficiary previously designated under the Accidental Death and Dismemberment Plan, we are enclosing the necessary form. Please complete and sign the form before a witness. Return the form to this office. We are attaching a sheet showing examples of beneficiary designations which may be of help to you in selecting words to fit your situation. P.S. We have AD and D certificate No. 91905 in our possession.

This letter dated August 13, 1962 has endorsed down at the bottom in handwriting "Ben. changed and new Cert. sent 8–22–62. RBC."

22. On August 15, 1962, Paul N. Vishino executed a Designation of Beneficiary card listing: "Eva M. Vishino, wife, if living; otherwise to Laura C. Freeman, sister, and James D. Vishino, brother in equal shares."

23. On August 22, 1962, a new Certificate of Insurance evidencing coverage under Group Policy ACC 68914 was issued by Skelly Oil Company at its offices in Tulsa, Oklahoma and was sent to Paul N. Vishino.

24. Paul N. Vishino, at the request of Skelly Oil Company, went to Tulsa, Oklahoma, to undergo a training program in the Skelly Oil Auditing Department there. While undergoing this training program, he stayed in a rooming house while there either at 2644 East 15th Street or 2647 East 15th Place in Tulsa, Oklahoma. His wife, the plaintiff, did not accompany him to Oklahoma and continued to live at their home, 5547 Wabash, Kansas City, Missouri. Following the completion of Paul N. Vishino's training program, he was to be assigned to a location in one of Skelly Oil Company's 15 marketing territories, but at the date of his death on November 5, 1962, he had not been assigned to any marketing territory.

25. Group Policy ACC 68914 as limited and provided by its terms was a group policy to provide insurance coverage to employees of Skelly Oil Company. At the time of the issuance of the policy on August 1, 1961 to Skelly Oil Company, Skelly Oil Company had employees in several states, including the states of Missouri, Oklahoma, Louisiana and North Carolina.

26. Plaintiff is the primary beneficiary under Paul N. Vishino's insurance coverage under Group Policy ACC 68914 in the principal sum of $25,000, which was in effect at the time of his death on November 5, 1962.

27. From July 31, 1961 until the present time defendant Aetna Life Insurance Company has been doing business in the State of Oklahoma and has been in the business of writing group life insurance policies in the State of Oklahoma.

28. Plaintiff from September, 1960 to the date of Paul Vishino's death November 5, 1962, was a citizen and resident of Kansas City, Missouri.

29. Deceased Paul Vishino at all times up to and including the date of his death, November 5, 1962, was a citizen and resident of Kansas City, Missouri.

30. Deceased Paul Vishino was at the time of his death suffering from a recognized and serious mental disease and disorder which caused him to take his life by gunshot wounds on November 5, 1962.

31. The serious mental disease and disorder which the Court has found the deceased was suffering from, so substantially impaired his reasoning faculties on the night of November 5, 1962 when he took his life, that he was not able to understand the moral character, nature and consequences of his action in taking his life, and he was impelled by an irresistible and insane impulse which he was powerless to resist.

32. At the time of shooting his wife and himself, the deceased Paul Vishino lacked both substantial capacity to appreciate the wrongfulness (criminality) of his conduct or to conform his conduct to the requirements of law.

33. Paul N. Vishino died as a result of a self-inflicted gunshot wound which was inflicted at a time when he was not able to understand the moral character, general nature, consequences, and effect of his act; at a time when he was not capable of knowing the difference between right and wrong. Vishino's act in inflicting a gunshot wound was the result of an insane impulse brought about by a mind incapable of distinguishing the difference between right and wrong.

34. At the time Vishino shot plaintiff and received the self-inflicted gunshot wound which resulted in his death, he was insane within the meaning of the applicable Missouri law.

35. It follows from our findings in regard to Vishino's mental condition that it is impossible to find that Vishino was in fact engaged in the commission of an alleged assault upon his wife immediately before his death. It is also impossible to find that the alleged commission of the alleged assault was in fact a direct cause of his death or that the alleged commission of the alleged assault in fact increased the risk of Vishino's death. While we do not believe the factual circumstances are either relevant or material under applicable law, we expressly reject defendant's suggested findings to the contrary.

36. Because defendant apparently contends that plaintiff did not properly submit proof of loss it is necessary that we make detailed findings in that regard.

Article VI, Section 6 of the policy dealing with proofs of loss provides in part as follows:

"Written proof covering the occurrence, the character, and the extent of loss must be furnished to the insurance company in case of claim for any loss within ninety days after the date of such loss. Failure to furnish such proof within the time required shall not invalidate or reduce any claim if it is not reasonably possible to give proof within such time, provided such proof is furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the employee, later than one year from the time proof is otherwise required . . . "

37. Article VI, Section 7 of the policy in part provides as follows:

"Benefits payable under this policy for any loss will be paid immediately upon receipt of due written proof of loss."

38. The knowledge Skelly Oil Company had concerning the plaintiff's eventual claim under the group policy involved in this case dates back to information it received in connection with the routine processing of another group policy issued by Atlas Life Insurance of Tulsa, Oklahoma, which was paid on December 4, 1962. Correspondence included in Plaintiff's Exhibit No. 3 establishes that Mr. Weidemier of Skelly's Kansas City office corresponded with Mr. Newton in Skelly's employee relations department in Skelly's home office in Tulsa. Notations over Mr. Weidemier's initials establish that as early as November 23, 1962, he knew that plaintiff had employed Mr. Benanti "to take care of insurance."

More significantly, a memorandum to "Weidy" under a date of December 10, 1962, the day that the Atlas claim was paid in full, stated that: "The reason for the lawyer seems to be to try to collect AD&D insurance, on the basis that Vishino's death was accidental. You'll

probably hear from Benanti again." The substance of that memorandum was communicated to Mr. Newton of Skelly's Tulsa office by an inter-office communication from Mr. Weidemier on December 17, 1962. The December 17, 1962 communication shows that Mr. Weidemier and Mr. Newton had already discussed the matter when Mr. Weidemier was in Tulsa and concluded with the statement: "We'll probably hear more from him [Mr. Benanti, plaintiff's counsel] and I wanted to keep you informed so you could be ready to defend if they try to force collection on the AD&D policy."

39. As anticipated, Skelly did hear more from Mr. Benanti. On January 3, 1963, Mr. Benanti wrote Mr. Newton of Skelly advising him he had, on November 20, 1962, written Aetna Life Insurance Company directly in regard to Mr. Vishino's death, but that: "To date we have had no response to our request for forms necessary for Proof of Loss, so that claim may be made under this policy."

Group Policy No. ACC–68914 and Mr. Vishino's certificate No. 91905 were specifically identified in that letter and Mr. Benanti requested that proof of loss forms be sent him "at your earliest convenience." Mr. Newton replied to Mr. Benanti's letter, with a copy to Mr. Kohl, Aetna Life Insurance Company, Tulsa, Oklahoma, on January 4, 1963. Mr. Newton stated that he understood that Paul Vishino had died as the result of a self-inflicted bullet wound of the head and stated that "Under such condition no claim would be payable by Aetna under Group Policy ACC–68914." He added: "I refer you to page 3 of the certificate where, under Section 3(e), suicide is named as an exclusion of benefit." Mr. Benanti was not sent the forms he had requested. Mr. Newton simply advised him that if he had any other information "that the death of Mr. Vishino was accidental and within the scope of the policy, he should acquire necessary claim forms from Mr. W. A. Kohl of Aetna Life Insurance Company."

40. On January 7, 1963, Mr. Benanti wrote Mr. Kohl of Aetna as directed and requested "blanks so that proper proof of loss can be made concerning the accidental death of Paul N. Vishino on November 5, 1962, in Kansas City, Missouri."

41. Mr. Kohl did not respond to Mr. Benanti's letter. Rather, he immediately forwarded copies of the correspondence between Mr. Benanti and Mr. Newton (referred to in Finding 39) to the Life Claim Department, Group Section of Aetna's home office with the advice that "We thought you should be aware [that] they are apparently going to make claim despite the fact that it [an officially recorded suicide] is a specific exclusion." A copy of that communication was also sent "Mr. Emory L. Smith, Attorney, Aetna Casualty & Surety Company, Tulsa."

42. On January 9, 1962, Mr. Emory Smith promptly advised the Home Claim Department of Aetna that "Tulsa will do nothing on this case until we hear from you." He recognized that "Someone should of course reply to Attorney Benanti's letter of 1–7–63 to Mr. Kohl requesting claim forms and you may want to ask Kansas City to conduct an investigation." Mr. Smith requested that he be given instructions. Mr. Kohl's teletype of January 10, 1963 to the Aetna's Life Claim Dept., Group Section, also requested home office advice in regard to Mr. Benanti's request for claim forms. He reiterated that "Mr. Emory L. Smith, Atty. Aetna Cas. & Surety suggested we get your approval before sending claim forms."

43. It was not until January 16, 1963 that Mr. Benanti received any response to his request for forms. And that response was not from Mr. Kohl to whom he had been directed to write. Rather, Mr. Raftery of Aetna Life Insurance Company, Hartford, Connecticut, wrote Benanti a letter in which he stated generally that "we have been furnished with copies of correspondence on this matter" and, inaccurately, that such correspond-

ence "appears to be the first notice that we have had here of a possible claim." In regard to claim forms, Mr. Raftery stated that: "This is a Group Policy and usually proof of death are furnished by the employer." Mr. Benanti was further advised that: "If you will furnish us with a copy of the official certificate of death, we shall give the claim further attention."

44. Mr. Raftery sent a blind copy of his letter to Mr. Benanti dated January 16, 1963 to Mr. Kohl. He privately advised Mr. Kohl that Mr. Kohl's teletype of January 10 had not reached him until January 15. Mr. Kohl was therefore directed to "arrange to have the upper half of the proof of death claim completed by the policyholder and furnish us with a copy of the insurance record card." Mr. Raftery stated that Aetna would then "await the death certificate to determine what further action we will take." He advised Mr. Kohl that "if Attorney Benanti insists this was not suicide, we shall conduct our usual investigation."

45. Defendant concedes that on or about January 21, 1963 Aetna in fact received the completed Employer's Proof of Death Form from Skelly, which had been privately requested of Mr. Kohl on the blind copy of Mr. Raftery's letter of January 16, 1963 to Mr. Benanti.

46. On January 21, 1963, Mr. Raftery again wrote Mr. Benanti, stating that:

Since writing you on January 16, 1963, we have been furnished with information indicating that the insured committed suicide.

Since this policy covers only death resulting from accidental means, it does not appear that we have any liability.

The note Mr. Raftery wrote Mr. Kohl on the blind copy of this letter which he sent Mr. Kohl thanked Mr. Kohl for a note received from him which enclosed "newspaper clippings." The fact that Aetna was fully advised of the nature of the claim is reflected by Mr. Raftery's added statement that: "I do not under-stand how Mr. Benanti hopes to make an accident out of this."

47. On January 24, 1963 Mr. Benanti forwarded to Mr. Raftery the death certificate which had been requested in Mr. Raftery's letter of January 16, 1963. Aetna, of course, by that time was fully advised of the circumstances of Mr. Vishino's death. Mr. Raftery did not, however, "give the claim further attention," as he stated he would in his letter to Mr. Benanti of January 16, 1963. Indeed, the denial of liability, for the reasons stated in Mr. Raftery's letter of January 21, 1963 reflected the defendant's final position in regard to the claim. That position was communicated to Mr. Kremer, Manager of Skelly's insurance division, by Mr. Kohl's letter of January 24, 1963 in which he transmitted a copy of Mr. Raftery's letter of January 21, 1963 to Mr. Benanti and in which he stated "If any further development occurs, we will let you know."

48. On January 29, 1963, Mr. Raftery acknowledged Mr. Benanti's letter of January 24, 1963 as follows:

I have your letter of January 24, 1963, and transcript of death record.

As I advised you previously, no particular Proof of Death Form is needed from the beneficiary since this is usually handled by the employer.

All the beneficiary need do is furnish us with some proof that the insured died as the result of accidental means and we shall conduct our usual investigation.

The longhand notation on the office copy of Mr. Raftery's letter to Mr. Benanti of January 29, 1963 which stated: "Policy also excludes liability if loss results from committing or attempting to commit an assault, battery, or felony," corroborates the fact that defendant had already finally rejected plaintiff's claim. It is significant, both factually and legally, that defendant never suggested to plaintiff that its rejection of claim was in any way related to the assault, battery, or felony clause in the policy.

49. It is clear, under all the circumstances, that defendant had made up its mind that it had a legal defense to plaintiff's claim for the reasons stated in Mr. Raftery's letter of January 21, 1963 to Mr. Benanti, which fact was communicated to Skelly by Mr. Kohl three days later. We find that Mr. Raftery never intended to conduct any further investigation because he was convinced that on the basis of the factual data then within his possession, including but not limited to the newspaper clippings which he had received, that any further proof of loss was not necessary or required under the circumstances.

50. Plaintiff's claim lay dormant until after the Supreme Court of Missouri en banc decided Sommer v. Metropolitan Life Insurance Co., 449 S.W.2d 644 on February 9, 1970, and until after additional counsel entered the case for plaintiff.

51. On March 15, 1971, plaintiff's old and new counsel wrote defendant, attention Mr. Raftery, a letter which stated in part:

It is our belief that under Missouri law and in particular, Sommer v. Metropolitan Life Insurance Co. [Mo.], 449 S.W.2d 644, your company is liable for the death benefit of $25,000.-00, plus interest.

52. On March 24, 1971, Mr. Egan, Assistant Secretary of Aetna's home office claim department, replied to plaintiff's counsels' letter of March 21, 1971. That letter set forth the reasons why defendant intended "to continue to deny liability." It stated that the group policy "is a contract made under the laws of the State of Oklahoma" and that "in addition the deceased became insured under this policy while a resident of the State of Oklahoma." That letter, of course, illustrates the fact, which we expressly find, that Aetna was not and had not at any time been concerned about the form of plaintiff's proof of loss in continuing to deny all liability. It also illustrates the fact that Aetna was erroneously attempting to treat Mr. Vishino's temporary presence in Oklahoma for purposes of the training program as "residence" in Oklahoma, apparently in an effort to build up contacts which Oklahoma had in regard to the master group insurance policy between two national companies.

■ 53. In regard to defendant's contention that it was somehow prejudiced by plaintiff's alleged failure to submit a proper proof of loss, we expressly find that defendant was able to conduct adequate investigation covering the death and events of Paul N. Vishino subsequent to March 15, 1971 to sustain its alleged defenses to plaintiff's claim. We further find that defendant was not in fact prejudiced in that investigation because of any alleged delay on plaintiff's part in supplying proof of loss. We expressly reject defendant's suggested findings to the contrary.

### III. CONCLUSIONS OF LAW

1. The Court finds that plaintiff's claim and cause of action arose in Missouri and is governed by Missouri, rather than Oklahoma, law.

2. The Court finds plaintiff's cause of action is governed by the Missouri ten year statute of limitations; and plaintiff's cause of action was filed within such time after her cause of action arose.

3. The Court finds that the defendant's policy provisions for a lesser time are barred and rendered null and void under the statutory public policy of Missouri and the Missouri law applicable to this case.

4. The Court finds that the deceased's insane suicide (as detailed in the findings of fact herein) was an accidental death within the meaning and language of defendant's insurance policy and that the insurer's affirmative defense of policy exclusion against "suicide, sane or insane" must be denied under the statutory public policy of Missouri and the Missouri law applicable to this case. Section 376.620, R.S.Mo., as construed by the Supreme Court of Missouri is applicable to this case.

5. The Court finds that the defendant's affirmative defense of policy exclusion concerning "committing an assault, battery or felony" must be denied because under applicable Missouri law:

(a) The defendant originally did not deny liability on this ground, and instead did solely deny liability only on the ground of suicide.

(b) The exclusionary actions claimed were not in fact the proximate cause of Paul Vishino's death.

(c) The deceased, in any event, did not possess the requisite intent under the Court's findings of insane suicide herein to establish such exclusionary conduct.

6. The Court finds that defendant's affirmative defense of alleged failure by plaintiff to file proof of loss must be denied because, in law and in fact, the same was waived by the defendant.

7. The Court finds there is due plaintiff the principal sum under the defendant's policy of $25,000.00; and that she is entitled under the law to simple interest at 6% from the date of January 21, 1963 on such sum.

8. The Court finds that under the applicable Missouri law plaintiff is not entitled to penalties and attorney's fees may not be awarded under Section 374.-420, R.S.Mo.

### IV.

The defendant apparently decided to make this case a "test case" sometime between January 16, 1963, when plaintiff's counsel was advised that the defendant would give plaintiff's claim further attention if furnished an official certificate of death, and January 21, 1963, when defendant denied liability for the stated reason that it had information that the insured had committed suicide and was, therefore, not covered by the policy. Defendant's letter of March 24, 1971 stated it must *"continue* to deny liability."

That letter reiterated defendant's legal contention, which it continued to assert at trial, that it could not be held liable because the "group policy was issued to Skelly Oil Company and is an Oklahoma contract" and that "In our opinion, therefore, Missouri law does not apply." Defendant has conceded with commendable candor in its trial brief that Section 376.620, R.S.Mo., commonly known as the Missouri Suicide Statute, "has been interpreted by the Missouri courts to mean that where one dies as a result of self-inflicted wounds, such death is considered an accident when the deceased is insane at the time of his death." In light of our findings of fact, including specifically our finding in regard to the insured's mental condition at the time of his death, it is apparent that plaintiff is entitled to recover under Missouri law, unless defendant has some other valid defense. We shall assume for purposes of this phase of the case that the exclusion clause would be valid under Oklahoma law and that plaintiff would not be able to recover if Oklahoma law were applicable.

*Klaxon Company* and *Erie* require that we follow the conflict of laws rules prevailing in Missouri in our determination of whether Missouri or Oklahoma law should be applied to this question. The problem, of course, is complicated by the fact that both parties implicitly concede that there are no Missouri cases directly in point. Both parties rely upon the rationale of various Missouri cases; neither contend that the precise question has in fact been presented and decided by any Missouri court. Under that circumstance, we must, under familiar and established principles, determine and apply the rules which we believe the Supreme Court of Missouri would probably follow when and if the precise question presented is decided by that court.[1]

---

1. See Hacker v. Rector, (W.D.Mo., 1966) 250 F.Supp. 300 at 301, and Adams Dairy Company v. National Dairy Products Company, (W.D.Mo., 1968) 293 F.Supp. 1135 at 1145, 1149, 1151, and 1162–1163, for cases in which this Court was required

In Taylor v. Royal Insurance Company, (W.D.Mo., 1964) 235 F.Supp. 891, Chief Judge Becker concluded that it was not necessary, under the circumstances of that case, to make the forecast which must, under the circumstances, be made in this case. What was said, however, in that case is most helpful in the determination of this case. *Taylor* was a diversity action by a Missouri insured to recover on a floater policy, applied for in Iowa while the plaintiff was only temporarily physically present in that state, for a loss which had occurred in Illinois. Defendant contended in *Taylor* that a provision in the policy which provided that all actions on the policy be commenced in one year should be recognized in Missouri because the contract was an Iowa contract and because contractual limitations on the time for bringing an action were upheld under Iowa decisions. Such a provision, of course, is void under Missouri law by reason of Section 431.030, R.S.Mo.

Chief Judge Becker concluded, as we have concluded in this case, that "Missouri law governs on the questions of choice of law." He then noted that "one difficulty here is that Missouri is not committed to definite choice of law rules applicable to the determination of the validity of contracts," directing attention to In re De Gheest's Estate, 362 Mo. 634, 243 S.W.2d 83; Campbell v. Sheraton Corp. of America, 363 Mo. 688, 253 S.W. 2d 106; Restatement, Conflict of Laws, Mo.Annot. § 332.

Distinguished Missouri counsel involved in *In re De Gheest's Estate* confronted the Supreme Court of Missouri with the black letter language of the various and conflicting rules of decision stated in numerous Missouri cases. Judge Barrett acknowledged in *De Gheest's Estate* that "It is true, as the executor urges, that the Missouri courts have often quoted the statement from Scudder v. Union National Bank of Chicago, 91 U.S. 406, 23 L.Ed. 245, 'Matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made.'" And Judge Barrett quite agreed with opposing counsel who directed attention to the language of Smoot v. Judd, 161 Mo. 673, 61 S.W. 854, 856 (and other cases) which had, with apparent equal force, declared that "the law of the place where the contract is to be performed is the law of the contract."

Judge Barrett, with his familiar judicial candor, frankly stated that "the Missouri courts have not always been consistent or scrupulously careful of the precise issue involved." He added that:

The fact of the matter is "The Missouri decisions are not entirely harmonious and it is not easy to deduce any satisfactory conclusion as to whether this State is committed to a definite rule," Bour & Parks, "Missouri Annotations to The Restatement of The Law of Conflict of Laws," p. 140. [362 Mo. 634, 243 S.W.2d at 88].

The Supreme Court of Missouri in *In re De Gheest's Estate* did not attempt to resolve the obvious conflict in the cases, concluding that "it would serve no useful purpose to attempt an analysis and reconciliation of the Missouri cases, they are all cited and classified in the annotation and their conflict is merely typical of the general conflict existing in the other jurisdictions." [2] Interestingly

to forecast probably future decisions by the courts of Missouri. In our determination of the rules which the Supreme Court of Missouri would probably follow, as Chief Judge Sobeloff stated in Lowe's North Wilkesboro Hdwre. v. Fidelity Mut. Life Ins. Co., (4 Cir., 1963) 319 F.2d 469 at 472 (in which a not dissimilar conflict of laws question was presented) we must simply forecast Missouri's rule and we "must . . . not fashion a rule which

we, as an independent federal court, might consider best."

2. Professor Reese, the Reporter for the Second Restatement of Conflict of Laws, shows that Judge Barrett was on sound ground in reference to the law of other jurisdictions. In his article, "Power of Parties to Choose Law Governing Their Contract," 1960 Proc.Ann.Soc.Int'l.L. 49–50, Reese stated: "By common consent,

enough, however, after making an accurate anaylsis of the various theories of Professors Beale, Goodrich, Lorenzen, Heilman, Nussbaum and Cook, the Supreme Court of Missouri apparently accepted the latter's criticism of the place of contracting theory and concluded that:

> When all the circumstances are taken into consideration, the situation of the parties at the time, the exigencies of their needs, the force of the setting and background, the essential nature of the transaction and the facts as they now present themselves Missouri has necessarily come to be the place of performance, and it does but little violence to any settled rules or doctrines concerning conflict of laws to say that the essential validity of this transaction is governed by the law of Missouri . . . [ibid at 91].

That approach, of course, is quite consistent with the rationale of the "grouping of contracts" or "center of gravity" theory to which Chief Judge Becker directed attention in *Taylor*. At the time *Taylor* was decided in 1964, that particular theory was only being proposed for inclusion in the Second Restatement of Conflict of Laws. That proposal, which has recently been finally approved by the American Law Institute, was, as we shall develop later in more detail, based upon an explicit rejection of Professor Beale's successful incorporation of his dogmatic vested rights doctrine which had been incorporated in the original Restatement, published in 1934.

It is familiar judicial knowledge that Beale's vested rights doctrine was subjected to early and contemporaneous academic attack by Professors Cook, Lorenzen and Cavers. The Reporter for the Second Restatement, Professor Willis Reese of Columbia University Law School, and Professor Austin W. Scott of Harvard Law School, Associate Reporter, joined those who have pointed out that the practical application of Beale's apparent absolute rules created more problems than they solved and that his theories simply had not gained judicial approval by courts that went very far beneath the surface.[3]

Although Chief Judge Becker concluded that *Taylor* could be decided without reaching the conflict of laws question presented in that case, he appropriately suggested that the then existing (1964) uncertainty in regard to what rule would be applied by the Supreme Court of Missouri could be an indication that the Missouri courts might reconsider the various rules it had announced in the past and join the trend toward acceptance of the rationale of the rules then proposed in the Second Restatement. *Taylor* stated in that regard that:

> This lack of certainty [in regard to any definite choice of law rule] might be consistently explained under the "grouping of contacts" or "center of gravity" theory discussed in 16 Am.

---

contracts is the most confused and most uncertain area in conflict of laws. American courts, to be sure, frequently purport to apply some hard-and-fast rule, as that a contract is governed by the law of the place of contracting, which is the place where the last act that is necessary to make the contract binding took place, or by the laws of the place of performance. But the judges who adopt this approach rarely practice what they preach. Sometimes they evade the rule they have announced by giving a different meaning to a key term, as the place of contracting. More frequently, they change the rule itself from case to case, and yet talk in each individual opinion as if the rule re-

lied upon in that particular instance stood alone without competitors.

3. Footnote 6 in § 42 of 16 Am.Jur., 2d 66, cited by Chief Judge Becker in *Taylor*, pointed out that: "It is said in the Introductory Note to the Contracts Chapter of Restatement Second, Conflict of Laws (Tent.Draft No. 6, 1960) that this new approach is in accord with what most American cases have done and with what some of them, especially recent ones, have said, as well as in accord with what the English courts have done and, in an indirect way, with what they have said in speaking of the proper law of the contract or the presumed intent of the parties".

Jur.2d, Conflict of Laws § 42; but this is not presently ascertainable under Missouri law. The trend in the nation is toward acceptance of the "center of gravity" theory proposed in Restatement (Second), Conflict of Laws §§ 332(b) and 379. [235 F. Supp. at 893].

We are convinced that the 1969 decision of the Supreme Court of Missouri in Kennedy v. Dixon, (Sup.Ct. of Mo. en banc 1969) 439 S.W.2d 173, clearly forecast that court's eventual abandonment of its prior admittedly confusing and conflicting conflict of laws rules as they relate to contracts in favor of the rules set forth in Chapter 8 of the Second Restatement of Conflicts of Law for the reasons we state in the next part of this opinion. We therefore conclude that the question noted by Chief Judge Becker in 1964, when *Taylor* was decided, in regard to whether Missouri will join the national trend toward acceptance of the basic theory then proposed in the Second Restatement, must in light of the rationale upon which Kennedy v. Dixon is based, be decided in the affirmative, and that, accordingly, we are under duty to apply the appropriate rules of the Second Restatement to the factual circumstances of this case.

### V.

Kennedy v. Dixon presented the question of "whether Missouri should retain or abandon the *lex loci delicti* rule in the choice of law applicable in foreign tort cases" [439 S.W.2d at 181]. Judge Finch noted that the plaintiff properly recognized that "Missouri has been following the so-called *lex loci delicti* rule" under which "the court applies the law of the place where the tort was committed in everything except procedure, which is governed by the law of the forum" [Id at 180]. He also noted, however, that

this has not always been the law, stating that "at one time, the rather generally accepted rule of conflicts in the case of torts occurring in another state was that the law of the forum should be applied" [Id at 180]. And he significantly added that the change had "apparently resulted from the Beale theory of vested rights" which became the rule "stated in the original Restatement on Conflict of Laws" [Id. at 180].

Kennedy v. Dixon, in much the same manner as had *In re De Gheest's Estate*, cited the criticism which legal scholars had made of Beale's vested rights doctrine and noted that those authors "have been practically unanimous in the view that the *lex loci delicti* rule is too harsh and inflexible and is an unsatisfactory rule." It was then stated that:

This development is reflected in the Proposed Official Draft of the Restatement (Second) on Conflict of Laws, which abandons the *lex loci* rule as set forth in the original Restatement, and, in § 145, adopts the so-called principal contacts rule as follows: . . . [439 S.W.2d at 181].

After quoting § 145 of the Second Restatement in full, Judge Finch then noted that a recent comment in 33 Missouri Law Review 81 had discussed the developments in this conflict of laws field and had suggested that "the Restatement (Second rule provides the most logical choice of law rule for Missouri" [Id. at 181]. Kennedy v. Dixon explicitly stated that the decision to abandon Missouri's rule based on Beale's vested rights doctrine was "not an easy one" to make [Id. at 181]. The Supreme Court of Missouri recognized that "a majority of the states still adhere to the *lex loci delicti* rule" and that some courts had expressly refused to adopt more flexible principles "on the basis of the rule of *stare decisis*." [4] In Kennedy v. Dixon, however,

4. Shaw v. Lee, 258 N.C. 609, 129 S.E.2d 288, was cited as an example. The North Carolina court refused to abandon the inflexible approach commanded by an acceptance of the vested rights doctrine by stating that it did "not deem it wise to

voyage into an uncharted sea, leaving behind well established conflict of law rules." The late Judge Storckman, the sole dissenter in Kennedy v. Dixon, expressed a similar view by stating that "In these days when the role of the rule of

the court noted the same trend which Chief Judge Becker had earlier noted in *Taylor;* proceeded to discuss in detail and cite cases from New York, Wisconsin, Kentucky, Iowa, New Hampshire, Rhode Island, Minnesota, New Jersey, Illinois, Arizona, and Pennsylvania; and stated that: "We have concluded that we should abandon the inflexible *lex loci delicti* rule in favor of the rule set forth in § 145 of the Proposed Official Draft of Restatement (Second) on Conflict of Laws." [Id. at 184].

The Supreme Court of Missouri recognized in Kennedy v. Dixon that abandonment of the old rule which called for a "mere mechanical determination" might make the judicial task of applying the new rule more difficult until additional cases established further guidance for trial courts. But Kennedy v. Dixon made clear that any difficulties which may be encountered in applying the Rules of Second Restatement were more apparent than real. It stated that "in most, and perhaps in all, cases it should be possible for the trial court to determine the state with the most significant contacts and relationship to the issues involved." [Id. at 185].

In expressly adopting the Second Restatement's conflict of law tort rules, an admittedly more difficult rule to apply, the Supreme Court of Missouri made clear that it did so for the same reasons the American Law Institute rejected its earlier adoption of Beale's vested right doctrine in the original Restatement in favor of the general principles stated in

§ 145 of the Second Restatement. That section states the basic general principle that "the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." [5]

Section 188(1) of the Second Restatement in Chapter 8 relating to contracts uses exactly the same language as § 145 except the word "contract" is substituted for the word "tort." Any other statement of the rule applicable to contracts would be irrational because both the inflexible rule of *lex loci delicti* and the equally inflexible rule of *lex loci contractus* were but different reflections of the rejected vested right doctrine. The introductory Notes to Chapter 7, in which the rules applicable to torts are stated, and Chapter 8, in which the applicable contract rules are stated, make cross-references to each other and establish that the rejection of the vested rights doctrine in regard to torts commands a like rejection in regard to contracts.

The Introductory Note to the new tort rules states the following in explanation of "The Position Taken by the Original Restatement:"

The original Restatement stated that, with minor exceptions, all substantive questions relating to the existence of a tort claim are governed by the local law of the "place of wrong." . . . This rule of the original

law is becoming more indistinct and less respected, there is virtue in refusing to experiment when the need is not clearly demonstrated."

5. Section 6 of the Second Restatement provides:

Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

    (a) the needs of the interstate and international systems,

    (b) the relevant policies of the forum,

    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

    (d) the protection of justified expectations,

    (e) the basic policies underlying the particular field of law,

    (f) certainty, predictability and uniformity of result, and

    (g) ease in the determination and application of the law to be applied.

Restatement was derived from the vested rights doctrine which called for the enforcement everywhere of rights that had been lawfully created under the local law of a state. In effect, the doctrine provided for the application of the local law of the state in which had occurred the last act necessary to bring a legal obligation into existence. In the case of torts, the state of the last act, for reasons stated above, was the state where the injury had occurred. In the case of contracts, it was the state where the contract was made (see Introductory Note to Chapter 8). [p. 412]

Consistent with what Kennedy v. Dixon stated so clearly, the Introductory Note to the tort rules described "The Present Approach" of the Second Restatement as follows:

The vested rights approach of the original Restatement has been rejected in the present Chapter. Instead, the rights and liabilities of the parties in tort are said to be governed by the local law of the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties. Separate rules are stated for different torts and for different issues in tort. In other words, the identity of the state of most significant relationship is said to depend upon the nature of the tort and upon the particular issue.[6] [p. 413]

The Introductory Notes to Chapter 8 of the Second Restatement relating to contracts used precisely the same rationale in explaining the rejection of the inflexible *lex loci contractus* rule. In regard to the position taken by the American Law Institute in the original Restatement with respect to the contract rule, it was stated:

The original Restatement provided (a) that issues of validity are determined by the local law of the place of contracting, which was the place where occurred the last act necessary under the forum's rules of offer and acceptance to give the contract binding effect, assuming, hypothetically, that the local law of the place where the act occurred rendered the contract binding (§ 332), and (b) that issues of performance are determined by the local law of the place of performance .(§ 358). These rules were derived from the vested rights doctrine which was also responsible for the adoption by the original Restatement of the rule that rights and liabilities in tort are determined, with certain exceptions, by the local law of the "place of wrong" (see the Introductory Note to Chapter 7). The vested rights doctrine has not prevailed in the courts and is rejected in the present Chapter and throughout the present Restatement. [p. 557]

It is clear that both the validity of the old *lex loci delicti* rule and the validity of the old *lex loci contractus* rule rested entirely upon the validity of Beale's vested right doctrine. We conclude without difficulty that in deciding Kennedy v. Dixon the Supreme Court of Missouri made the same considered and deliberate rejection of the discredited vested rights doctrine as did the American Law Institute when it promulgated entirely new conflicts of laws rules for both tort and contract actions.

We therefore conclude that it must be judicially anticipated that Missouri will take the same logical step required by its abandonment of the vested rights doc-

---

6. The reason for the changes were explained as follows:

These changes are partly a reflection of a change in our national life. State and national boundaries are of less significance today by reason of the increased mobility of our population and of the increasing tendency of men to conduct their affairs across boundary lines. These changes also reflect a changed attitude on the part of the courts. Judges are more prepared than formerly to consider the basic policies and values underlying choice of law. In reaching their decisions, the judges give greater weight to the choice-of-law policies stated in § 6 than to the demands of some legal theory, as that of vested rights. [p. 413]

trine in regard to contracts as it took in regard to torts and that the rules of the Second Restatement in regard to both subjects will be adopted as the law of Missouri.[7]

## VI.

We believe our conclusion that the Supreme Court of Missouri will probably adopt the Second Restatement's conflict of law rules as they relate to contracts is consistent with the decisions of other courts that have considered similar questions.

Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), the rationale of which was heavily relied upon by the Supreme Court of Missouri in Kennedy v. Dixon, illustrates the direct impact that an abandonment of the vested rights doctrine has on both the old *lex loci delicti* rule and the old *lex loci contractus* rule of a particular jurisdiction. Contrary to the sequence in which the questions have been presented in Missouri, New York was first called upon to reexamine the validity of the vested rights doctrine in a case in which the old *lex loci contractus* rule was challenged. The question relating to the proper contract rule was presented to the New York Court of Appeals in 1954 in the leading case of Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954). It was in that case that New York, almost twenty years ago, definitely abandoned its confused set of old mechanical rules and adopted the "center of gravity" or the "grouping of contacts" theory of conflict of laws later codified in the Second Restatement.[8] When, nine years later in 1963, the question of whether the old *lex loci delicti* rule should also be discarded was presented to the New York Court of Appeals, that court recognized that the foundation for that rule had already been undermined by its earlier decision in Auten v. Auten. That court noted in the 1963 case of Babcock v. Jackson that the "traditional" rule had been embodied in the original Restatement and that it "had its conceptual foundation in the vested rights doctrine," a doctrine which that court stated "has long since been discredited" 240 N.Y.S.2d at 746, 191 N.E.2d at 281). After taking appropriate notice of the "increasing criticism of the traditional rule by commentator and a judicial trend toward its abandonment or modification," the court stated:

Significantly, it was dissatisfaction with "the mechanical formulae of the conflicts of law" (Vanston Bondholders Protective Committee v. Green, 329

---

7. Defendant directs attention to Handley v. Lyons, (K.C.Ct. of App., 1971) 475 S.W. 2d 451, a case decided by the Kansas City Court of Appeals after Kennedy v. Dixon. It is true that some of the old *lex loci contractus* language from earlier cases was quoted in that case and that the Second Restatement rules were not mentioned. But defendant overlooks the fact that the result reached in that case, because of that court's emphasis and application of the "performance" language of the old rules (see footnote 2 above) permitted the application of a Missouri statute to an insurance contract admittedly entered into outside Missouri. So far as result is concerned. Handley v. Lyons supports plaintiff's rather than defendant's position.

Closer in point, but not overly persuasive, is the 1971 opinion of the St. Louis Court of Appeals in American Institute of Marketing Sys. Inc. v. Clarke, (St.L.Ct. of App., 1971) 469 S.W.2d 937, in which that court apparently assumed without discussion that the Supreme Court of Missouri's opinion in Kennedy v. Dixon required that intermediate appellate courts to apply § 186 and perhaps other Sections in Chapter 8 of the Second Restatement.

While the two cases cited were decided by intermediate appellate Missouri courts and should therefore be given appropriate consideration under familiar *Erie* principles, we do not believe that either affords a proper basis for predicting how the Supreme Court of Missouri will probably decide the question presented in this case because in neither case was the question in precise focus or the subject of any detailed discussion.

8. Auten v. Auten and Babcock v. Jackson are both cited and extensively quoted from in the Reporter's Notes to § 188 and § 145, respectively, of the Second Restatement to support the theory adopted to support the rules stated in those sections.

U.S. 156, 162, 67 S.Ct. 237, 239, 91 L.Ed. 162) which led to judicial departure from similarly inflexible choice of law rules in the field of contracts, grounded, like the torts rule, on the vested rights doctrine. [240 N.Y.S. 2d at 747 191 N.E.2d at 281–282].

The New York Court of Appeals concluded that the considerations which required the abandonment of the vested rights doctrine required the "center of gravity" or "grouping of contacts" rule in regard to both tort and contract actions. It stated that:

> The "center of gravity" or "grouping of contacts" doctrine adopted by this court in conflicts cases involving contracts impresses us as likewise affording the appropriate approach for accommodating the competing interests in tort cases with multi-State contacts. . . . The merit of such a rule is that "it gives to the place 'having the most interest in the problem' paramount control over the legal issues arising out of a particular factual context" and thereby allows the forum to apply "the policy of the jurisdiction 'most intimately concerned with the outcome of [the] particular litigation.'" Auten v. Auten, 308 N. Y. 155, 161, 124 N.E.2d 99, 102, supra. [Ibid 240 N.Y.S.2d p. 749, 191 N.E.2d 283 p. 283]

Federal courts, when faced with the same *Erie* problem presented in this case, have ruled the question presented in this case in accordance with the views we have stated. Poffenbarger v. New York Life Insurance Company, (S.D.W. Va., 1967) 277 F.Supp. 726, involved a group policy issued to the Trustees of the American Road Builders' Association Insurance Trust Fund in which plaintiff's employer, Criss and Shawer, Inc., a West Virginia corporation, was a participating employer. All documents relating to the master group policy were executed in the District of Columbia. As in this case, only plaintiff's certificates of insurance were delivered in West Virginia, the forum state. Under West Virginia law the defendant could not attack the in-

contestability provisions of the policy. Defendant New York Life, of course, contended West Virginia law should not be applied because the master group policy had been in fact delivered in the District of Columbia and, under the old *lex loci contractus* rule, the federal court could not look to West Virginia law.

Although apparently faced with a line of West Virginia cases which articulated the old *lex loci contractus* rule since at least 1870, Judge Field concluded that the mere repetition of the broad language of the "traditional" rule did not control the "choice of law to be applied in this troublesome area of group insurance contracts and the delivery of certificates thereunder" (277 F.Supp. at 730). He noted that "some states have applied the law of the state in which the master policy was delivered, while others have applied the law of the state in which the delivery of the certificate was effected." Although Boseman v. Connecticut Gen. Life Ins. Co., 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036 (1937), was recognized as supporting the first line of authority, the court concluded that West Virginia would probably follow the second in order to do justice to a resident of West Virginia. More significantly, however, Judge Field predicated his grant of plaintiff's motion for summary judgment on a second theory. He stated:

> Finally, it is not unreasonable to assume that our West Virginia Court in a case such as this might choose to apply the relatively new "grouping of contacts" theory of the conflict of laws. This theory would permit the forum to apply the law of the jurisdiction most intimately concerned with the outcome of the particular litigation. See Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 50 A.L.R.2d 246 (1954). [277 F.Supp. at 731]

The fact that the certificate of insurance was delivered in West Virginia to a West Virginia resident was noted as a particularly significant circumstance which a West Virginia court could properly recognize together with the fact

that West Virginia had passed specific legislation in regard to group insurance policies. It was therefore concluded that:

> The totality of these contacts and circumstances alone might well persuade the West Virginia Court to apply West Virginia law and recognize its holding in *Morris* [Morris v. Missouri State Life Ins. Co., 114 W.Va. 278, 171 S.E. 740] as controlling on the facts of the present case. Certainly such a conclusion would not offend the basic principles of justice. [Ibid]

The court's conclusion in Zogg v. Penn Mutual Life Insurance Company, (2 Cir., 1960) 276 F.2d 861, we believe, is also helpful. Although a group policy was not involved, that court made clear that abandonment of the old *lex loci contractus* rule eliminates the necessity for all scholastic and metaphysical discussion in regard to where a particular insurance policy may have been delivered. The question presented was whether the New York Suicide Statute should be applied in a diversity case brought by a New York citizen in a federal court in New York. Under Massachusetts law the suicide exclusion in the policy was enforceable. Penn Mutual, as does defendant Aetna in this case, contended that the old *lex loci contractus* rule be applied to the end that Massachusetts rather than New York law be applied.

Judge Clark assumed for purpose of decision "that a complete and binding insurance agreement was formed in Massachusetts." He said, however, that the real question was whether the New York Suicide Statute, N.Y. Insurance Law, McKinney's Consol.Laws, c. 28 § 155, was nevertheless applicable. The court refused to consider the extent to which the old rules may be said to be generally applicable today in the contract field, particularly in the area of adhesion contracts, in the insurance field.[9] *Zogg* went to the heart of the matter by stating that "we find the considerations

which led the New York Court of Appeals in Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99, 101, 50 A.L.R.2d 246, to adopt a flexible choice-of-law rule looking to the 'center of gravity' of the contract *a fortiori* applicable to the agreement here involved."

After citing more recent New York cases, the court stated:

> The insured was at all times a resident of New York; the defendant was licensed by New York to engage in the business of life insurance within the state; the policy was mailed by defendant's agent to the insured's residence in New York; and the original beneficiary was a resident of New York, as is the plaintiff herein. Under these circumstances a New York court could only conclude from a "grouping of the significant contacts" that the validity of the contract and its provisions is controlled by the internal law of the forum, which includes its public policy as legislatively expressed. [Ibid]

The court significantly added that "the same result follows from our determination that § 155 is, by its terms, applicable to this insurance policy." The same thing is true in this case, for the New York Suicide Statute, like the Missouri Suicide Statute, is written in extremely broad terms. Section 155 of the New York Statute provided that it was to apply to any policy of life insurance "delivered or issued for delivery in this state." In similar manner, in Section 376.620, the Missouri Suicide Statute, the Missouri General Assembly provided that it was to be applicable to all "policies of insurance on life hereafter issued by any company doing business in this state, to a citizen of this state."

In answer to the defendant's contention that the place of physical delivery of the policy was a relevant consideration in the construction of the New York

---

9. For a full discussion of what is meant by a "contract of adhesion" or a "take-it-or-leave-it" contract, see Judge Franks' dissenting opinion in Siegelman v. Cunard White Star, (2nd Cir., 1954) 221 F.2d 189 at 204–206, and the authorities cited therein.

Suicide Statute, the court concluded that:

> [T]he primary purpose of the enactment was to protect residents of the state and that the tests of delivery or issuance for delivery in the state were adopted as a practical means of achieving such protection. . . . Historically, policy applications often provided for acceptance by the insurer at its home office; and it is unlikely that the legislature adopted a reference to technical rules of contract formation which would permit such ready evasion as would largely impair the effectiveness of the regulation. [Id 276 F.2d at 865]

In quite a different context, Judge Learned Hand stated the underlying reason why parties are neither permitted nor able to evade the laws of a jurisdiction in which they elect to do business. In E. Gerli & Co. v. Cunard S. S. Co., (2nd Cir., 1931) 48 F.2d 115 at 117, he said:

> People cannot by agreement substitute the law of another place; they may of course incorporate any provisions they wish into their agreements —a statute like anything else—and when they do, courts will try to make sense out of the whole, so far as they can. But an agreement is not a contract, except as the law says it shall be, and to try to make it one is to pull on one's bootstraps. Some law must impose the obligation, and the parties have nothing whatever to do with that; no more than with whether their acts are torts or crimes.

We are satisfied that our forecast of the view Missouri would probably take in regard to the choice-of-law question presented is consistent with the cases we have discussed. We shall accordingly apply the rules stated in the Second Restatement to the particular circumstances of this case.

## VII.

We have found as a matter of fact that, under the standards of Missouri law, the insured was insane at the time he committed suicide. Section 376.620, R.S.Mo., provides that under those circumstances in all suits upon life insurance policies issued by any company doing business in Missouri to a citizen of Missouri "it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void."

Sommer v. Metropolitan Life Insurance Company, 449 S.W.2d 644, decided by the Supreme Court of Missouri en banc in 1970, removed all doubt about the meaning and effect of that statute. Nor can there be any doubt that the exclusion clause in the policy involved in this case is void under the statute and contrary to the legislatively declared public policy of the State of Missouri.

■ Defendant does not make the obviously untenable argument that Section 376.620 is not broad enough to cover a group insurance policy. Defendant's argument is that Section 376.620 cannot properly be applied in this suit by a citizen and resident of Missouri against an insurance company doing business in Missouri, under Missouri's old *lex loci contractus* conflicts rule, and that Oklahoma rather than Missouri law should be applied to the facts of this case. We have concluded that Missouri's abandonment of the vested rights doctrine in regard to conflict of laws rules generally requires the further conclusion that Missouri will probably abandon its particular rule in regard to contracts in the same manner as it did in regard to torts and that the rules stated in Chapter 8 of the Second Restatement must be applied to the circumstances of this case. We shall accordingly apply those rules for the reasons stated.

Section 192 of the Second Restatement of Conflicts of Law, which we have concluded would probably be applied by the Supreme Court of Missouri, provides:

> The validity of a life insurance contract issued to the insured upon his

application and the rights created thereby are determined, in the absence of an effective choice of law by the insured in his application, by the local law of the state where the insured was domiciled at the time the policy was applied for, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied. [p. 600]

The phrase "in the absence of an effective choice of law by the insured in his application" in § 192 must ·be read and understood in context. Directly involved so far as this case is concerned, is defendant's argument that an apparently standard recitation in the master policy to the effect that it was "a contract between the Policyholder and the Insurance Company and shall be construed in accordance with the law of the jurisdiction in which it is delivered" reflected an "effective choice of law" on the part of the insured within the meaning of that and other sections of the Second Restatement. We conclude that argument is not tenable.

Comment c. under § 192 states the rationale upon which that section is based. It is there stated:

In the absence of an effective choice of law by the parties (see Comment e), the rule of this Section calls for application of the local law of the state where the insured was domiciled at the time the policy was applied for unless, with respect to the particular issue, some other state has a more significant relationship to the contract of insurance and the parties. Whether there is such another state should be determined in the light of the choice-of-law principles stated in § 6. For a general discussion of the application of those principles to the contracts area, see § 188. Comments b–d. What is said in those Comments is applicable here. [p. 601]

Comment c. then stated that "there are several reasons why such importance is attributed to the state where the insured was domiciled at the time the policy was applied for." Those reasons were stated as follows:

Life insurance is a matter of intense public concern, as is evidenced by the fact that it has been subjected to extensive statutory regulation by the great majority of states. Issues arising under a life insurance policy should be determined by the local law of the state which has the dominant interest in the insured with respect to these issues, and this state will usually ·be that where the insured was domiciled at the time the policy was applied for. Likewise, a major purpose of life insurance legislation is to protect the individual insured and his beneficiaries, and the courts have sought to assist in the achievement of this purpose by means of their choice-of-law rules. They have done so by requiring that, at least as a general rule, the insured should receive the protection accorded him by the local law of his domicil. [p. 602]

Comment e. to § 192, incorporated by reference in the first sentence of Comment c. is entitled "Choice of Law by the parties." It there stated, omitting exceptions not applicable to the situation presented in this case that:

[E]ffect will not be given to a choice of law provision in a life insurance contract designating a state whose local law gives the insured less protection than he would receive under the otherwise applicable law, which, as stated in Comment c., will usually be the local law of the state where the insured was domiciled at the time the policy was applied for. One factor serving to explain disregard in this instance of the chosen law is that life insurance contracts are drafted unilaterally by the insurer, and the insured is then given the opportunity on a "take-it-or-leave-it" basis of adhering to their terms.

\* \* \* \* \* \*

Since life insurance is a matter of intense public concern and since the major purpose of legislation in this area is to protect the individual insured and his beneficiaries, it might well be repugnant to a fundamental policy of the state of the otherwise applicable law to give the insured less protection than this state would accord him under its own local law (see § 187, Comment g). [pp. 603 and 604]

■ The leading case cited in the Reporter's Note to support Comment e. is New York Life Insurance Co. v. Cravens, 178 U.S. 389, 20 S.Ct. 962, 44 L.Ed. 1116 (1900). That case affirmed the Supreme Court of Missouri's decision in Cravens v. New York Life Ins. Co., 148 Mo. 583, 50 S.W. 519 (1899). The *Cravens* case, of course, is an excellent example of Missouri's long and consistent view that clauses inserted in insurance contracts which provide that the policy shall be construed in accordance with the law of a state other than Missouri are void insofar as they attempt to prevent Missouri courts from applying a particular Missouri statute in actions brought on those policies in a court of Missouri.[10]

Comment g. to § 187, incorporated by reference in Comment e. to § 192, is entitled "When application of chosen law would be contrary to the fundamental policy of state of otherwise applicable law." That Comment states in part that:

Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interests and for state regulation. . . . The forum will apply its own legal principles in determining whether a given policy is a fundamental one within the meaning of the present rule and whether the other state has a ma-

terially greater interest than the state of the chosen law in the determination of the particular issue. [pp. 567–568]

And, with a cross reference back to § 192, explained further that:

To be "fundamental" a policy must in any event be a substantial one. . . . a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power. Statutes involving the rights of an individual insured as against an insurance company are an example of this sort (see §§ 192–193). [pp. 568–569] [11]

Still further light is thrown on the rationale of § 192 by reference to Comments b–d under § 188 to which attention was specifically directed in Comment c. to § 192. Comment b. under § 188, relating to the rationale upon which that section is based, states that "The extent of the interest of a state in having this rule applied should be determined in the light of the purpose sought to be achieved by the rule and by the relation of the transaction and the parties to that state (see Comment c). [p. 577]. And Comment c. under § 188, devoted to the purpose of the new contract rule and incorporated by reference in Comment b., states:

The purpose sought to be achieved by the contract rules of the potentially interested states, and the relation of these states to the transaction and the parties, are important factors to be considered in determining the state of most significant relationship. This is because the interest of a state in having its contract rule applied in the determination of a particular issue will depend upon the purpose sought to be

---

10. Missouri's non-forfeiture statute was involved in the *Cravens* case. The Supreme Court of the United States affirmed Missouri's rule that the Missouri non-forfeiture statute became a part of the insurance policy issued by a foreign corporation to a Missouri resident and such statute "annuls the provisions of the policy which contravene the statute."

11. Section 193 states exactly the same rule for contracts for fire, surety, or casualty insurance as that stated in § 192 for life insurance contracts.

achieved by that rule and upon the relation of the state to the transaction and the parties. So the state where a party to the contract is domiciled has an obvious interest in the application of its contract rule designed to protect that party against the unfair use of superior bargaining power. [p. 578]

Specific reference to § 192 and to its Comments and to the Comments to other sections incorporated by reference therein must be read and considered in light of the completely new approach made by the Second Restatement. That approach is obviously in sharp contrast to the rejected and over-simplified vested right doctrine approach of the original Restatement. The Introductory Note to Chapter 8 of the Second Restatement commences with the humble recognition that "Contracts is one of the most complex and most confused areas of choice of law." Because "this complexity is increased by the many different kinds of contracts and of issues involving contracts and by many relationships a single contract may have to two or more states," the American Law Institute divided the general topic relating to the validity and rights created by contracts in three separate titles.

Title A, which includes §§ 186–188 and is entitled "General Principles," states that those sections define "the general approach to be followed in determining choice-of-law questions involving contracts." Title B (§§ 189–197) "deals

with particular kinds of contracts," and Title C (§§ 198–207) "with particular issues involving contracts." The general principles stated in Title A are generally applicable to each particular type of contract and many of the rules stated in Titles B and C relate back to the overall statement of choice-of-law principles enunciated in § 6.

It is necessary to keep the overall relationship of the various topics, titles, and sections of the Second Restatement in mind because failure so to do is an invitation to return to the road of confusion injected into the field by the original Restatement's too ready acceptance of Beale's vested rights doctrine. Specifically, the idea that the parties to a contract may choose the law of the state to govern their contractual rights is a statement of only an apparently broad principle. The limitations stated in § 187(2) (a) and (b), which are reiterated again and again in other sections, are very real limitations on the apparently broad principle stated in § 187(1) and must be so considered.

Defendant's argument, for example, based upon an isolated reading of Comment h. to § 192 reflects an effort to read but a part of an integrated rationale out of context.[12] It is true, of course, that Comment a. to § 192, entitled "Scope of section" says: "As to group life insurance and contracts issued by fraternal benefit associations, see Comments *h* and *k*." But that single sentence does not

---

12. Comment h. to § 192 reads as follows in its entirety. (We shall later make reference in the text to the words which we have italicized in this footnote):

h. Group life insurance. In the case of group life insurance, rights against the insurer are *usually* governed by the law which governs the master policy. This is because it is desirable that each individual insured should enjoy the same privileges and protection. So where an employer arranges for group life insurance for its employees, the rights of a particular employee against the insurer will *usually* be determined, in the absence of an effective choice-of-law clause and *at least as to most issues* not by the local law of the state

where the employee was domiciled and received his certificate but rather by the law governing the master policy with respect to that issue. This will *usually* be the state where the employer has his principal place of business. Choice-of-law provisions contained in group life insurance policies are more likely to be given effect than in the case of ordinary life insurance. This is because the organization or individual which procures the master policy will usually have a stronger bargaining position than an individual insured with the result that the choice-of-law provision is less likely to have a "take-it-or-leave-it" character.

mean that all principles applicable to group life insurance are exclusively stated in Comment h.

In Oakley v. National Western Life Insurance Company (S.D.N.Y., 1968) 294 F.Supp. 504, Judge Motley in footnote 4 on page 509, italicized the same words in what is now Comment h. to § 192 as we italicized in footnote 12 above. That court stated that "It must be noted that this comment acknowledges the possibility that as to some issues the normal choice of law provisions apply."

To a federal judge in the Southern District of New York, the "normal" conflict of laws rule would be, as illustrated both by *Zogg* and *Oakley*, the principles stated in Auten v. Auten which were later codified in § 192. It is clear that Judge Motley's added conclusion that "We are of the opinion that the issue before us is one of those" and therefore controlled by the normal New York rule, was a specific reference to the issue of whether New York or Missouri law should be applied to a Missouri master policy upon which suit was being maintained in New York. That question was decided in favor of New York and was based both on the rationale of Auten v. Auten and § 192 of the Second Restatement.

We also add that, in our judgment, the last paragraph of Comment h. is not only an inaccurate statement of the economic realities of group insurance but that its language may present, if given a black letter application, a potential source of confusion in this complex area of law. The Reporter's Note to § 192 shows the last paragraph of Comment h. is something of a paraphrase of 1937 notions expressed in Boseman v. Connecticut General Life Ins. Co., 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036 (1937), in regard to group insurance. We indicate our agreement with what Judge Friendly said about *Boseman* in John Hancock Mutual Life Insurance Co. v. Schroder, (5th Cir., 1965) 349 F.2d 406 at 407. He described that case as "one of the last gasps of Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842)." [13]

It is quite difficult for us to conceive how one issued a certificate of insurance under a group policy negotiated by his employer with an insurance company would ever be in anything except a "take-it-or-leave-it" position. Although the employee frequently, as in this case, pays all of the premium, he probably has nothing to say even about what company is going to be chosen by his employer to write the policy. Best's Insurance Reports (1972) reveals that Aetna, the defendant in this case, is authorized to do business in all fifty states. Skelly, the employer in this case, according to the 1973 U.S.A. Oil Industry Directory, produces oil and gas in fourteen states and three Canadian provinces and markets its products in twenty-two states.[14] We believe that the notion implicit in the last paragraph of Comment h. under § 192 that Mr. Vishino, the beneficiary of the contract to the extent his money paid the premiums, was in some sort of position in which the law of some state other than the state of his residence was being chosen by him ignores the realities of the economic situation involved. Indeed, we believe that the "take-it-or-leave-it" situation, is, as a practical matter, more acute in regard to beneficiaries of group

13. *Boseman* somewhat paternalistically suggested in 1937 that "Employers regard group insurance not only as protection at low cost for their employees but also as advantageous to themselves in that it makes for loyalty, lessens turn-over, and the like." *Oakley*, decided a quarter of a century later, said that "If fringe benefits are considered important, the expanded coverage provided by this decision [applying New York, rather than Missouri, law to a Missouri master policy] will, presumably make it easier for Hess [the employer] to procure able employees." We believe *Oakley* has the better of that argument.

14. The stipulation of the parties in regard to the extent of business transacted by Aetna and Skelly did not purport to cover all the States in which either company transacted business. Both companies are obviously large national corporations.

insurance policies than other types of insurance where only two parties are involved. We further believe, contrary to the implications of the last paragraph of Comment h., that the principles concerning adhesion contracts mentioned by Judge Clark in *Zogg* and elsewhere are particularly applicable to group policy contracts in light of the ever increasing use of such policies throughout the land.

The decision in this case cannot properly come as a surprise to Aetna. The Missouri Suicide Statute is almost a century old. Knights Templars' Indemnity Co. v. Jarman, 187 U.S. 197, 23 S.Ct. 108, 47 L.Ed. 139 (1902), and the cases therein cited illustrate that courts have never shared insurance companies' apparent inability to understand that the statute has always meant exactly what it said and that it reflects a long standing public policy of the State of Missouri. *Jarman* stated over seventy years ago that the provision of the Missouri Suicide Statute "upon its face, applies to all insurance companies 'doing business in this state,' and to all policies issued by such companies after the date of the act," and that it "must be considered as imposing a condition upon every policy thereafter issued, notwithstanding any stipulation in the policy to the contrary." In Whitfield v. Aetna Life Ins. Co., 205 U.S. 489, 27 S.Ct. 578, 51 L.Ed. 895 (1907), the defendant in this case was definitely advised that under the prevailing legislative policy of Missouri "an insurance company and the insured [could not] lawfully stipulate that in the event of suicide, not contemplated by the assured when applying for a policy, the company shall not be bound to pay the principal sum insured." Exactly the same statute involved in this case was involved in the 1907 Aetna case. In both cases the insured died as a result of a self-inflicted gunshot. Aetna's policies in both cases contained the "suicide, sane or insane" language under which it attempted to limit its liability under the policies.

The Supreme Court of the United States concluded in *Whitfield* "that the statute is a legitimate exertion of power by the State cannot successfully be disputed." Giving the words of the Missouri Suicide Statute their natural, ordinary meaning, the Court stated that "the legislative intent was to cut up by the roots any defense, as to whole and every part of the sum insured, which was grounded upon the fact of suicide." It added that:

> The manifest purpose of the statute was to make all inquiry as to suicide wholly immaterial, except where the insured contemplated suicide at the time he applied for his policy. Any contract inconsistent with the statute must be held void. [205 U.S. at 496, 27 S.Ct. at 580]

Aetna and all other insurance companies have long been advised that any exclusion clauses based upon the apparently standard "suicide, sane or insane" language in Aetna policies are void under Missouri law. The Supreme Court of the United States stated the obvious in *Whitfield* when it said that "an insurance company is not bound to make a contract which is attended by the results indicated by the statute in question." But Aetna and all other insurance companies were properly advised in that case that if an insurance company elects to do "business at all in the state, it must do so subject to such valid regulations as the state may choose to adopt."

Aetna apparently did not remove its "suicide, sane or insane" clause from policies insuring Missouri residents as a result of the Supreme Court's 1907 decision in *Whitfield*. It should be clear, however, that Aetna's continued effort to ignore Missouri's declared public policy designed to protect Missouri insureds and their beneficiaries must be dealt with in 1973 in the same manner as in 1907. For, to borrow the same words borrowed by the Supreme Court in *Whitfield* from an early St. Louis Court of Appeal's opinion, "we cannot hold that the present stipulation can be enforced without violating the plain terms of a mandatory statute which the parties have no power to alter or abrogate."

Applying the principles stated in the Second Restatement, we specifically find and conclude that, within the meaning of § 192 of the Second Restatement, no effective choice of law was made by the insured in his application for coverage under the group insurance policy and that, accordingly the law of Missouri, the State in which the insured was domicited at the time he applied for coverage, should be applied in the determination of this case. It is our further finding and conclusion that no State other than Missouri has a more significant relationship to the particular issue presented.

The State of Missouri has long evidenced its public concern in the field of insurance by the enactment of numerous protective legislative acts, including but not limited to Section 376.620. We find and conclude that the purpose of the latter statute was for the benefit and protection of insured Missouri residents and their beneficiaries. The insured was a resident of Missouri when he applied for the insurance and throughout the coverage of the policy. The fact that he was temporarily in Oklahoma is immaterial; he had not made any change in his legal residence. The cause of action on the policy arose in Missouri. The beneficiary was then a resident of Missouri. Oklahoma has no significant or legitimate concern with the transaction which would suggest that its law, which would give the Missouri insured less protection than he would receive under the law of his domicile, should be applied. We find and conclude that Missouri has the most significant relationship to the particular issue to be determined and that its law is properly applicable to the circumstances of this case.

We further find and conclude that the public policy expressed in Section 376.620 is a fundamental policy designed to protect Missouri residents and their beneficiaries from the type of exclusion clauses found in the policy involved in this case which should be given appropriate recognition in the interest of justice. Neither Oklahoma nor any other State has any legitimate interest which militates against Missouri's application of its own statutory law and rules of decisions in that regard in favor of Missouri residents. In short, we find and conclude that Missouri has the most significant relationship to the transaction and the parties under principles stated in the Second Restatement and that the rights and duties of the parties with respect to the question presented in this case should be determined by the law of Missouri and that under that law plaintiff is entitled to recover.

## VIII.

In light of the fact that cases presenting questions similar to the questions presented in this case usually find their way to the Court of Appeals, we shall comment briefly on other questions presented. Defendant's trial brief raised eight questions. Although defendant did not discuss all eight questions in its post-trial memorandum brief, defendant did not expressly abandon its position in regard to any of the questions initially presented. We shall therefore discuss each of the questions raised in defendant's trial brief in the order there presented.

1. Defendant's first point stated its contention in regard to § 376.620, the Missouri Suicide Statute. Further discussion of that point is redundant.

2. Paragraph 2 and Paragraph 3 discussed the presumption of sanity, the burden of proof which rests upon a plaintiff to establish that the deceased was insane, and the applicable test of insanity under Missouri law. Those points need not be extensively discussed because we considered the case in accordance with the rules apparently agreeable to the defendant. In making our specific findings in regard to plaintiff's mental condition, we applied the test of insanity advocated by the defendant in resolving the conflicting evidence in plaintiff's favor.

4. Defendant contended in its trial brief (but not in its post-trial brief) that the plaintiff was barred from recovering for the reason that at the time of

his death the deceased was engaged in the commission of an assault, battery, or felony, within the meaning of an exclusion clause in the policy.

Under the facts as we have found them, the defendant denied liability on January 21, 1963, by advising plaintiff's attorney that it had information that the defendant had committed suicide and that "since this policy covers only death resulting from accidental means, it does not appear that we have any liability."

The notion that the policy excluded liability for a loss resulting from the commission of an assault, battery, or felony apparently did not occur to the defendant until January 29, 1963, when that thought was communicated on a blind copy of a letter written by Mr. Raftery to Mr. Kohl on January 29, 1963. At no time, however, did the defendant communicate that thought to plaintiff in connection with any denial of liability.

Delmar Bank of University City v. Fidelity Deposit Co. of Md., (8th Cir., 1970) 428 F.2d 32 at 35, stated the applicable Missouri law when it said that "it is quite clear in Missouri that when . . . an insurance company denies liability on one basis, it waives all defenses to the claim not asserted in their declination of payment." Four relatively recent Missouri cases were cited in support. That principle is applicable under the facts as we have found them.

We also found on the facts that the asserted policy defense is not supported by the evidence in light of our findings in regard to deceased's mental condition. Defendant concedes that the Missouri test for criminal responsibility at the time of the offense is substantially the same test applicable to this case. Our finding in regard to the deceased's mental condition therefore would absolve plaintiff of any criminal responsibility in connection with any alleged assault, battery, or felony. We so find and conclude.

5. Defendant contended in its trial brief (but did not carry over in its post-trial brief) the contention that the plaintiff was barred from recovery "for the reason that the death of the deceased was not an accident." The argument was made that "one may not recover accidental death benefits wherein the death of an insured is a foreseeable result of his own acts." We find and conclude that it is doubtful that the Missouri cases relied upon by defendant state such a rule and that, in any event, those cases are distinguishable on the facts as we have found them in this case. We so find and conclude.

6. Defendant has argued that the plaintiff failed to supply "due proof of loss" and that such failure materially prejudiced the defendant. We made very full findings of fact in that regard. Our factual findings distinguish this case from Kaplan v. Guardian Life Insurance Company of America, (W.D.Mo., 1964) 231 F.Supp. 874. In this case the defendant was fully and accurately advised of the factual circumstances under which the insured met his death. It seems to us quite obvious that the defendant was fully satisfied on the basis of information in its possession that it had a legal defense and that additional factual investigation was unnecessary.

It is also clear to us that defendant received what it asked from the plaintiff in regard to formal proof of loss papers and that, in sharp contrast to the factual circumstances presented in Kaplan, conducted its correspondence with plaintiff's counsel in a manner which was somewhat lacking in forthrightness and apparently designed to induce plaintiff's counsel not to press plaintiff's claim. On the basis of the detailed factual findings, we conclude that defendant waived any more detailed proof of loss than that submitted and that, in any event, defendant was not in fact prejudiced under the circumstances.

7. In its trial brief, but not in its post-trial brief, defendant contended that the plaintiff was not entitled to the recovery of any interest, relying upon New York Life Ins. Company v. Griesedieck, (8th Cir., 1941) 116 F.2d 559. That case, in our judgment, does not sup-

port defendant's argument. Consistent with the action of the Supreme Court of Missouri in Sommer v. Metropolitan Life Insurance Co., *supra*, interest will be allowed.

8. Defendant resisted plaintiff's claim that the statutory penalties and reasonable attorney's fees should be awarded under § 375.420, R.S.Mo. Plaintiff directs our attention to Handly v. Lyons, *supra*, in which the Kansas City Court of Appeals affirmed Judge Cook's award under the statute. That case, however, makes clear that under Missouri law "each case must turn on its own particular facts," and that an award under the statute is not proper unless there is substantial evidence to support a finding that a defendant's refusal was willful, unreasonable, and without probable cause.

Cases in the Court of Appeals for the Eighth Circuit (Western Casualty & Surety Co. v. Southwestern Bell Tel. Co., (8th Cir., 1968) 396 F.2d 351; United States v. F. D. Rich Co., Inc., (8th Cir., 1971) 439 F.2d 895, and United States Fidelity & Guar. Co. v. Empire State Bank, (8th Cir., 1971) 448 F.2d 360) indicate that federal district judges sitting in Missouri on occasion have failed to apply § 375.420 as conservatively as the Court of Appeals believes the Missouri rules of decision apparently require. We must assume that the Court of Appeals would be of the opinion that Columbian Nat. Life Ins. Co. v. Keyes, (8th Cir., 1943) 138 F.2d 382, would be considered to be distinguishable on its facts. In light of the Supreme Court of Missouri's refusal to allow any penalty or attorney's fees under § 375.420 in the *Sommer* case, in which a quite similar question was presented, we find and conclude that plaintiff's contention in regard to § 375.420 is not tenable.

For the reasons stated, it is

Ordered that the Clerk of the Court should enter judgment for the plaintiff in accordance with the Rules of Civil Procedure in the amount of $25,000.00, plus interest thereon from January 21, 1963, at the rate of 6% per annum in accordance with law. It is further

Ordered that no allowance to plaintiff of any penalty or attorney's fees will be made under § 375.420.